[S. F. No. 14230. In Bank.—July 30, 1931.]

ADDIE CARLSON et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION, BELLE CECELIA RODGERS et al., Respondents.

R. P. Wisecarver and Redman, Alexander & Bacon for Petitioners.

Edward O. Allen and George C. Faulkner for Respondents.

THE COURT.—This is a petition to review an award of the Industrial Accident Commission. On February 13, 1930, Manuel Rodgers was killed while blasting trees on a fruit ranch owned by Mrs. Addie Carlson. His wife and daughter applied for a death benefit, and the Commission found that they were wholly dependent upon him. The Commission also found that Rodgers died from injuries sustained in the course of and arising out of his employment, and made an award in the sum of $5,150. The petition is by Mrs. Carlson and Columbia Casualty Company, her insurance carrier. It is claimed that Rodgers was, at the time of his death, not an employee of Mrs. Carlson but a tenant under a lease given by her..

A written instrument, executed by Mrs. Carlson and Rodgers, was introduced in evidence. This instrument, it is contended, is in form a lease and conclusively establishes the status of Rodgers as a tenant. There is no question but that it contains language suggestive of a lease. It commences with the statement that "in consideration of the covenants and agreements herein contained . . . the said Mrs. Addie Carlson does hereby lease and farmlet unto the said Manual Rodgers, for a term of five (5) years . . . her orchard"; it further speaks of "the premises leased herewith"; and it contains an agreement by the party of the second part "that he will not let . . . the premises leased hereby, without first getting the written consent of the

party of the first part''. It also provides that upon violation of its terms, the party of the first part ''may then at her option terminate this lease''. However, the use of such terminology is not conclusive. The instrument does not use the term ''rent''; it provides that the party of the second part shall ''occupy and work the premises'' and ''employ a sufficient number of good and skillful farm-hands'' to do the work; the party of the first part agrees to furnish materials and equipment; one-half the net proceeds of the crop is to be paid by the party of the first part to the party of the second part; and the party of the second part is subject to supervision to an extent which suggests that he was employed as a foreman to manage the ranch. The ambiguity in this document requires careful construction, and the effect of its provisions is of more importance than the manner of their statement.

Examining those provisions, we find several which establish such an extensive control by Mrs. Carlson and her agents over the activities of Rodgers that were they taken alone, there would be little doubt that the relationship was that of employer and employee. Under these circumstances, it becomes necessary to interpret, and if possible to reconcile the provisions. ▆ This the Commission proceeded to do; and to that end testimony was taken to show the inception of the agreement, the understanding of its purport by the party who drafted it and the various parties concerned with it, and the practical construction thereof by such parties in their subsequent acts. The competency of such evidence cannot be questioned. As the court said in *Luckie* v. *Diamond Coal Co.*, 41 Cal. App. 468, 478 [183 Pac. 178, 182] : ▆ ''We do not think that the relation of master and servant, and none other, is conclusively established by the written contract of employment. But even if it were, that would not prevent the parties from changing that contractual relation and establishing another. Where the parties to a written contract of employment, *by mutual consent inferred from their subsequent conduct,* have modified their contract and have acted upon it as thus modified, it is valid, in the modified form, to the extent and during the period it was so acted upon and carried out. As between a third party and either party to the contract, such change or modification unquestionably could be shown

by parol. In an action between a party to a contract and a third party, the rule that parol evidence cannot be received to contradict or vary a written contract does not apply, as the estoppel on which the rule rests must be mutual, and, since the third person is not bound by the contract as written, neither is his adversary in the action. . . . Accordingly, it has been held' that, in an action of this character, while, *prima facie*, the relation of the parties to a written contract of employment is that which is expressed by the terms of their writing, nevertheless, in order to determine their true relation, such contract should be considered in view, not only of the *circumstances under which it was made*, but of the *conduct of the parties while the work is being performed."* (Italics ours.) (See, also, *Tennant* v. *Wilde*, 98 Cal. App. 437. [277 Pac. 137].)

█ The conclusion of the Commission, as we have said, was that Rodgers was an employee engaged to produce a crop and receive his compensation in the form of a share of the profits. Petitioners, in attacking this conclusion, assert that the issue in this case, and the only issue, is whether the *instrument* in question is a lease. But the real issue, as we have indicated, is whether the *relationship* of the parties was that of landlord and tenant, or employer and employee. In determining that question, the Commission should naturally look first to the agreement; but the language of the agreement was sufficiently uncertain to call for construction, and the acts of the parties were such as to justify the consideration of extrinsic evidence. Hence our inquiry cannot be restricted to the question whether this written instrument was a lease or a contract of employment. The question before us is whether there is any evidence to support the finding of the Commission that Rodgers was the employee of Mrs. Carlson. If the record contains evidence which, coupled with reasonable inferences, offers some support for the finding, we have no power to disturb it. (*Hillen* v. *Industrial Acc. Com.*, 199 Cal. 577 [250 Pac. 570]; *Union Oil Co.* v. *Industrial Acc. Com.*, 211 Cal. 398 [295 Pac. 513]; *Gale* v. *Industrial Acc. Com.*, 211 Cal. 137 [294 Pac. 391].)

The record shows that Mrs. Carlson, who lived in San Francisco, owned a fruit ranch of some forty acres, near Newcastle, California. She was a member of the Newcastle

Fruit Growers' Association, which acted as her agent in connection with her ranch property. Some time in 1927 she had a conference with Rodgers, C. G. Werner, manager of the association, and George C. Henny, its field man. At this conference an agreement was reached between Mrs. Carlson and Rodgers, and Werner drew up the document which we have discussed, to embody the terms of that agreement. Neither of the parties thereto was represented by counsel, and Werner was not an attorney. ▮ This in itself suggests that the strict legal significance of the terms used in the instrument should not be permitted to prevail over the intention of the parties as disclosed by the evidence.

Of the various elements which tend to show employment, the most significant in all cases is that of control; and there is abundant indication in this case, both in the instrument itself and in the testimony, of an authoritative control contemplated and exercised by Mrs. Carlson and her agent, the association, over the work of Rodgers. The second paragraph of the agreement provides "that all work of every description shall be done under the *supervision* of the party of the first part, her agent or representative, and *in strict accordance with her wishes, ideas, and instructions,* and the different lines of work must be carried out in their proper time and season, *as directed* by the party of the first part". (Italics ours.) Werner, who drew the agreement, testified that the association, as agent of Mrs. Carlson, "had power to go in there and tell him what lines of work to perform at certain times". With respect to the above-quoted provisions, Werner stated that Rodgers "had a thorough understanding of that paragraph, and many times he would come in and ask us for advice or instructions on certain things and we would give it to him, and other times if it was something that was rather doubtful we would take it up with Mrs. Carlson, personally, and with our field man". He testified further as follows:

"Q. Did you have the power under the provisions of this agreement to tell Rodgers how to do his work and when to do his work, and whether to do it at all?

"A. Yes, sir.

"Q. You had full power under those provisions?

"A. Yes, sir.

"Q. Did you have power under that provision to tell Rodgers to quit work altogether?

"A. Well, of course, I suppose in one way, but I would not do that without first taking it up with Mrs. Carlson. If she told me, I certainly would."

Henny, field man for the association, testified that it was his duty to supervise the operation of the ranches of owners who were away, and to see that they were properly managed; that he had such powers in connection with the Carlson ranch; that with respect to Rodgers, he had the right to direct "the work that he had to do, and when to do it in regard to picking, spraying, plowing and all other necessary operations in conducting the ranch and making sure it was carried out". He stated that Rodgers consulted him and that he instructed him in his work. He further testified as follows:

"Q. Suppose if you had given him an order to respray a ranch, to respray this particular ranch and he had refused to do it, what were your powers?

"A. I would simply go in there with men and do the work over his head."

Certainly this was evidence of a type of control normally to be exercised only by an employer.

The other factor which we deem of importance is the manner in which Rodgers was to receive the reward for his labors. We find nothing in the instrument or in the rest of the record which indicates that he had title to the crops or any part thereof, without which he could hardly be deemed a lessee. The agreement provides: "All of the fruits produced upon the premises . . . must be picked and packed . . . according to the standardization rules and delivered to the Newcastle Fruit Growers' Association at its shipping house in Newcastle *for the account of and in the name of the party of the first part.*" Any attempt by the party of the second part (Rodgers) to sell any of the fruit without the written consent of the party of the first part is made grounds for termination of the agreement. It is finally provided that the net proceeds from the sale of the fruit shall be equally divided between the parties, "the party of the first part hereby agreeing to account for and *pay to the party of the second part his proportion of the net proceeds*". (Italics ours.) It is a reasonable infer-

ence from these provisions that the ownership of the crop was to remain in Mrs. Carlson, who had previously, by becoming a member of the association, contracted for its sale through the association; and that upon the sale by her of the crop, she would pay compensation to Rodgers measured by one-half the net proceeds.

Another provision of the contract authorized Mrs. Carlson's agent, the association, to advance to Rodgers "from time to time a reasonable amount for labor". Mrs. Carlson testified that this provision was included so that Rodgers could get money to pay the help which he would have to hire; that she thought she was responsible for such payments; that she had agreed with Rodgers to furnish the money for this purpose, and had guaranteed to pay for *his labor* in the event of a failure of the crop.

It also appears that various materials and supplies, such as a tractor, powder for blasting, etc., were obtained from the association under the terms of the agreement, and were charged by the association to Mrs. Carlson's account. Henny testified that they were not to be paid for by Rodgers, but were deducted from Mrs. Carlson's share of the proceeds.

The foregoing discussion leads to the inevitable conclusion that there was evidence before the Commission upon which it might, with the aid of permissible inferences, find that the relationship of employer and employee existed between Mrs. Carlson and Rodgers. That is all that we are called upon, or permitted to decide. It may be conceded that the document signed by the parties contains many provisions characteristic of a lease, and also that a consideration of the document itself, without other evidence, might have led to a contrary result. We do not state these provisions in detail. It is unnecessary to do so because their existence is undisputed and their effect is clear. Admittedly they created a substantial conflict in the evidence. The Commission has resolved that conflict in favor of the applicants for the award. The only legal question presented to us is whether the evidence of control, title to crops, and the other factors are sufficient to justify the finding of employment. We think they are, and authority is not lacking for our conclusion. (See *Hardeman* v. *Arthurs,* 144 Ark. 289 [222 S. W. 20]; *Chickasha Gas &*

*Elec. Co.* v. *Linn,* 80 Okl. 233 [195 Pac. 769]; 1 Tiffany, Landlord and Tenant, 185, sec. 20; 2 Thompson on Real Property, 95, sec. 1031.)

Petitioners make much of the fact that the instrument contained an agreement on the part of Rodgers to obtain· workmen's compensation insurance. They say that to exact such an agreement from an employee would be a misdemeanor under section 30 (a) of the act (Stats. 1929, p. 1167, sec. 1), and that it is clear that the parties fully understood that the relationship was that of lessor and lessee. Such a provision inserted by laymen is of course no more conclusive than the other language to which we have referred. But in this connection the record contains matter of considerable interest. It appears that some time after the instrument was executed C. W. Smith, district manager of Columbia Casualty Company, petitioner herein, solicited the members of the association to embark upon a plan of group insurance, and represented to the officers and members thereof, and to others, that the proper party to take out the insurance was the owner of the ranch. Many of the ranches were operating under agreements similar to the Carlson-Rodgers contract, and a number of policies were secured in reliance upon Smith's advice. Acting upon it, Rodgers allowed his policy to lapse, and Mrs. Carlson at that time took out coverage for herself. Werner testified that the parties considered the paragraph on insurance to have been stricken out from that time on. We agree with petitioners that the representations by Smith would not change the legal status of the parties, but the subsequent actions of the parties pursuant to their understanding reached at that time, causes the insurance provision to lose its significance as an indication of that relationship.

Counsel for petitioners assert that this case presents the question whether a member of a growers' association, bound by contract to produce and deliver fruit in accordance with its requirements, can make a valid lease of a ranch. That is not the question at all. There is nothing to prevent a party in the situation of Mrs. Carlson from leasing a ranch. But she cannot reserve in a so-called lease the rights of an employer without becoming liable as one. It is the nature of the agreement and not its formal appearance which is controlling; and while, in the instant case, the

proper characterization of the relationship of the parties is a difficult task, we think the finding and award of the Commission is supported by the evidence.

The award is affirmed.

Rehearing denied.