[S. F. No. 16801.   In Bank.   July 8, 1943.]

PACIFIC LUMBER COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and JOHN TURKOVICH, Respondents.

Pillsbury, Madison & Sutro, Francis R. Kirkham and W. E. Pringle for Petitioner.

Everett A. Corten and Dan Murphy, Jr., for Respondents.

CURTIS, J.—On June 21, 1941, while cutting timber on land belonging to petitioner, the Pacific Lumber Company, John Turkovich was struck by a falling tree and suffered a

fracture of his leg. He filed a claim for compensation against the company before the Industrial Accident Commission. His claim was contested by the company on the ground that Turkovich was not in its employ at the time he received his injury. The commission found to the contrary, its finding being that "John Turkovich, while employed as a tie maker on June 21, 1941, at Redcrest, California, by Pacific Lumber Company, sustained injury arising out of and in the course of aforesaid employment when a tree fell upon him fracturing his right leg." Based upon this finding an award was made in favor of Turkovich. The sole question before us in this proceeding is whether there was any substantial evidence before the commission supporting this finding.

At the time Turkovich sustained said injury he was working under a written contract between himself and the Pacific Lumber Company (referred to hereafter as the company). This written contract purported to be a conditional sales agreement, and it recited that the company agreed to sell and Turkovich agreed to buy certain designated trees for the purpose of cutting them up into logs and splitting the logs into ties, posts, shakes, stakes, etc., referred to in the written contract as "redwood split products." The price to be paid by Turkovich, the "Buyer," was determined "on the basis of board measure content of such timber suitable for manufacture by Buyer of such redwood split products." Such board measure and suitability were to be determined by a representative of the company and his decision was made conclusive upon both parties. This written contract was dated March 18, 1941, and provided that the "Seller hereby grants to Buyer a limited license of ingress into and egress from and occupancy of the portions of the real estate hereinabove described [being the land upon which the designated trees were standing] solely for the purpose of cutting said timber, so marked and designated, manufacturing or reducing the same into such redwood split products, storing such products and removing the same for sale and delivery elsewhere, . . . provided that this agreement is upon the condition that Buyer shall begin to cut or cause to be cut said timber so marked and designated on or before March 18, 1941, and shall have completed all of the cutting, reducing, manufacture, storage and removal of the resulting redwood split products herein referred to from the premises hereinabove described not later

than June 30, 1941. . . .'' Payment of purchase price of said timber was to be made on the 1st and 16th days of each month, or at such other times as may be mutually agreed upon.

Paragraphs 5 and 8 of the contract read as follows:

"5. Seller may at all reasonable times send inspectors on the premises in order to determine whether or not Buyer's operations are being conducted in a wasteful manner or are unnecessarily wasteful and destructive of the timber or the real property on which it is located. Buyer agrees to abstain from any practice which in the judgment of the Seller . . . is wasteful or destructive. For the purpose of preventing unnecessary waste Seller shall have the right to demand that all portions of each tree suitable for manufacture into split stock products be so utilized by Buyer.

"8. This agreement, or any right thereunder, may be assigned by the Seller but shall not be assignable by the Buyer without the consent of the Seller."

The company reserved the title and ownership of the timber and products manufactured therefrom until the purchase price was fully paid, with the proviso that Turkovich might have vested in him the title to such portions of said timber in lots of not less than 1,000 feet, board measure, upon payment of the purchase price. In case the Buyer failed to pay for the timber covered by the written contract, the company was given the right, among others, to sell the products manufactured therefrom to itself, at private sale without notice, and to hold Turkovich for the balance due, if any, of the purchase price after applying proceeds of said sale to payment of the purchase price.

If we construe the written contract without reference to any extrinsic considerations, we think it shows that the company retained control over Turkovich in many essential respects. The trees which were covered by the contract were designated and marked by the company, and Turkovich was required to convert them into "redwood split products." Turkovich had no part in their selection, nor did he have any right to the trees which he purported to buy except to use them for this one purpose. The company retained the right to determine "the board measure content" of such timber suitable for manufacture into split products, and its determination as to suitability and board measure was conclusive on both parties. The company retained the right to

send inspectors on the premises to determine whether Turkovich's manner of operation was wasteful or destructive of the timber or of the real property on which the timber was standing. The company retained the right to demand that all portions of each tree suitable for manufacture into split stock products be utilized by Turkovich. The company also retained the right to assign the written contract and to prevent Turkovich from assigning it or any of his rights thereunder. Turkovich is the one who had the right to cut the trees but he could not assign that right, thereby showing that although the transaction purported to be a sale, it called for purely personal services on the part of Turkovich.

The company retained the title to the timber and all products manufactured therefrom until the purchase price thereof was paid. It also retained the right to restrict the sale of the manufactured products by Turkovich to lots of not less than 1,000 feet, board measure. The company retained possession and control over the manufactured products as security for the payment of any amount due from Turkovich, and the right in a summary manner to sell the same to itself without notice at private sale. After applying the proceeds of the sale—less expenses, including attorney's fees—to the amount due from Turkovich, the company retained the right to hold Turkovich personally for any balance due in case the proceeds of the sale were not sufficient to satisfy said indebtedness. While the company blandly states that Turkovich had full control over his work, we submit that a reading of the contract shows to the contrary. We might ask what independence Turkovich actually had under the contract. As we will later show, only a few trees were covered by any one contract and, when this contract was finished, a like contract would be given for additional trees. Any manifestation of independent action on Turkovich's part (such as for instance, selling ties to persons other than the company) would simply end his employment. The company would simply stop "selling" trees to him and he would be through. The practical effect of the contract was to give the company complete control over Turkovich.

However, in a proceeding before the Industrial Accident Commission for an award for personal injuries, where it is contended that the written contract between the parties is not a contract of employment, oral evidence is admissible

to show the inception of the agreement, the situation of the parties at the time of the execution of the contract, and the practical construction of the contract by the parties thereto in their subsequent acts. (*Carlson* v. *Industrial Acc. Com.*, 213 Cal. 287 [2 P.2d 151]; *Luckie* v. *Diamond Coal Co.*, 41 Cal.App. 468 [183 P. 178].) Pursuant to the above proposition of law, the Industrial Accident Commission at the hearing of the present matter received in evidence not only the written contract, but evidence of the parties as to their business relations, their situation at the time the written contract was executed, and the subsequent acts of the parties thereto in operating under said contract.

The evidence shows that the company was the owner of certain timberland and was engaged, along with the general business of manufacturing and selling lumber, in the business of manufacturing redwood split products from timber belonging to it. This was a regular branch of its business, and it employed a number of tie makers for this purpose. It required all such split products for its own business, and in addition thereto it frequently had to buy such products from other parties in order to meet the demands of its trade. All such split products so produced by its employees were of course the property of the company and were subsequently sold by it to the trade.

There was but slight conflict in the evidence which showed that Turkovich was a tie maker by occupation and, as such, he was engaged in felling trees, cutting them into logs, and splitting the logs into ties and fence posts, referred to in the contract as "redwood split products." He had been so engaged with the company some four years prior to receiving his injury. At the beginning of his employment he was assigned a certain definite strip of land on which there were trees suitable to be manufactured into redwood split products. It was orally agreed between him and the company that he would convert these trees into ties and posts, and that he was to receive for his services a certain price per tie or post depending upon the size and measurement of the tie or post produced. He was admittedly an employee of the company under this oral agreement and was entitled to hospital service, social security benefits and workman's compensation. This form of employment continued until some time in 1940, when Mr. Skiffington, who had charge of the split products depart-

ment of the company, came to Turkovich and told him that the company was going to adopt a new system under which the tie makers were to produce split products from the timber belonging to the company. Under this new system the tie makers were to operate under a written contract and were to be without hospital service, social security benefits and workmen's compensation. To quote the testimony of Mr. Skiffington, when asked what Turkovich said when he was asked to sign the contract, "Well, he didn't like it too well, but he signed the contract and went on to work." This statement in a way agrees with that of Turkovich, who, when asked what he said on that occasion, stated "Well, what can I say? I was against it, you know, but I got to do something. I got a family to support it, but I can't get no other work because I am old age." Turkovich signed three of such contracts, each providing for the conversion of a certain number of designated trees into ties and posts. The first was dated October 24, 1940, the second December 14, 1940, and the third March 18, 1941. It was while working under this third contract that he was injured on June 21, 1941.

Petitioner, the Pacific Lumber Company, concedes that prior to the adoption of the plan providing for a written contract, Turkovich was in its employ and entitled to workmen's compensation and other benefits now enjoyed by employees. Turkovich testified that after the adoption of the new plan and the signing by him of the first of the three written contracts, as stated above, and during the entire time he was working under said contracts, he carried on his work as he had while he was admittedly an employee. He cut the trees covered by his contracts and converted them into ties and posts, and left the ties and posts on the ground as he did while working as an employee, and the company sent its trucks and hauled them away as it did previously. He received practically the same pay for his services after as he did before he signed any written contract. Before he worked under the new plan, he was paid as an employee every two weeks, and the written contract called for a settlement on the 1st and 16th of each month. He worked the same hours both before and after the new plan was put into operation. He never paid any money on the so-called purchase price of the timber. The company took all ties and posts which he made from the company's trees, and he sold none of them

to anyone. There is no evidence that the company ever agreed to pay him any stated amount for these ties and posts, or that he ever agreed to accept any price for the ties and posts which he had made. The company, so far as the records show, just assumed either that the ties and posts were its property or that under the terms of the contract between it and Turkovich it had bought the ties and posts from him. Mr. Skiffington testified that he paid Turkovich $15.50 per thousand board feet for ties of a certain length, but there is nothing in the record to show that he ever told Turkovich that he was to receive that amount, or that Turkovich ever knew what price he was receiving for "his" ties and posts. There are in evidence two checks from the company to Turkovich with certain notations thereon indicating that they were given for "Split Stock Purchases," but neither the amount of the stock "purchased" nor the price at which it was purchased is shown on either of these checks or on any other exhibit or testimony before the commission. He accepted the checks and, as they were practically the same in amount as those received by him before he started work under the written contracts, he asked no questions regarding them.

If we view this contract in the light of the situation of the parties at its inception, we have this situation. The company was in the business of converting its timber into ties and posts, and other redwood split products, and selling the finished products to the trade. Mr. Skiffington, in charge of the split products department of the company, so testified. He also testified that the company obtained its principal supply of such products from timber growing upon its own lands, but that the company frequently found it necessary, in order to meet the demands of the trade, to purchase such products from outside sources. It does not seem reasonable that the company, in entering into these contracts with its tie makers, ever intended that these products from its own timberlands would be sold by the tie makers to outside parties. Especially would this seem to be so when the supply from its own timber was insufficient to meet its own needs.

Reading the written contract in the light of this evidence, it would seem that the commission could reasonably have drawn the inference that the underlying purpose of said contract on the part of the company was to have its timber made into redwood split products for its own use, and for

the purpose of meeting the demand of its trade, rather than to sell them to the tie makers, to be resold by the latter to third parties. ▉ Furthermore, we think that this was the construction placed on the contract by the acts of the parties subsequent to its execution. Turkovich testified that he worked the same after this new plan was adopted as before. He worked the same hours and received the same pay; that he cut and split the trees into ties and posts as he did when he was admittedly an employee, and that the company came with its trucks and hauled them away as it did before. The written contract under which he was working at the time of his injury required that Turkovich should begin to cut the timber so marked and designated on or before March 18, 1941, and should complete all of the cutting, reducing and manufacture, storage and removal of the resulting redwood split products therein referred to from the premises described in the contract not later than June 30, 1941.

The construction placed upon this provision of the contract is shown by the evidence just narrated. Turkovich removed none of the manufactured products from the company's premises. In fact it is doubtful whether he ever had a chance to do so, as by his testimony, which is undisputed, after he cut and split the trees into ties and posts, the company came with its trucks and hauled them away as it did when he was working as an admitted employee of the company. The company treated the ties and posts produced under the written contract as its own property in the same manner as it did those previously produced by Turkovich as its employee, and so did Turkovich. He never assumed ownership over them. He paid nothing on the contract. He made no attempt to sell them nor to dispose of them in any manner, nor did he object at any time to their being hauled away by the company as it had previously done.

These acts of the parties under the contract after its execution justified an inference on the part of the commission that the parties thereto did not regard the ties and posts after their manufacture as the property of Turkovich, for the reason that the company assumed control of them and treated them the same as when they were produced by Turkovich as an admitted employee of the company, and this was done with the consent and concurrence of Turkovich.

▉ Therefore, whether we consider the situation of the

parties at the time of their entry into the written contract or the construction placed on the contract by the subsequent acts of the parties, we find ample justification for holding that the parties contemplated that these products of the company's timber in the shape of so-called "redwood split products" were to become the property of the company when produced under the terms of the contract. The contract therefore, as construed with reference to the situation of the parties at the time of its execution and the subsequent acts of the parties, was nothing more nor less than a method employed by the company to have its timber converted into split products for its own use to be used in its own business, and that it never intended that Turkovich should own the products or have any right to sell them. In legal effect it was a contract of employment of Turkovich by the company.

Before closing this opinion, we wish to call attention to some further points discussed in the briefs filed in the case. ▮ The first of these concerns the compensation received by Turkovich while working under the written contracts. We have made the statement that Turkovich received practically the same compensation after he operated under the written contract as he did while working for the company as an admitted employee. Turkovich so testified. At the close of the hearing before the commission the referee asked for a statement from the company showing the amount received by Turkovich before and after the written contract was entered into. The company, in answer to the request, mailed to the commission a letter of date October 1, 1941. This letter purported to give the receipts of Turkovich for one year prior to the execution of the first of said contracts, which showed that he received only a little over $100 per month. The letter also purported to give his receipts for ten months during which he was working under the written contracts and it showed that his monthly receipts were over $190 per month. In this letter the receipts of Turkovich were given for the month of April, 1941, at $367.11 and for the month of May, 1941, at the sum of $403.88. The company also introduced in evidence during the hearing, its Exhibit 6, which contained two checks given to Turkovich by it for the two months of April and May, 1941. The check for the month of April contained a notation as follows:

"Split Stock Purchases...................$367.11
Less Your Trade Ledger Account........ 186.36
                                        ————
                                        $180.75"

The check was for $180.75 only. A similar situation is shown on the check given for the month of May and is as follows:

"Split Stock Purchases...................$403.88
Less Your Trade Ledger Account........ 201.28
                                        ————
                                        $202.60"

This check was only for said amount of $202.60. As we interpret the notations on these checks, the item "Split Stock Purchases," from the company's standpoint, represents the amount the company paid Turkovich for the split products produced by him for the respective months, and the item "Less Your Trade Ledger Account" represents the amount Turkovich owed the company under the conditional sales contract for the timber used by him in producing said products. If we are correct in this interpretation of the checks, then Turkovich for these two months received only about one-half the amount which the letter of October 1 purports to show he did receive. As to the remaining months during which Turkovich operated under written contracts, there is nothing in the record to show directly that they are incorrect, nor is there anything to show that they are correct, as the company only offered in evidence the two checks for the months of April and May. As the statement in the letter of October 1 is shown to be decidedly incorrect for these two months, we do not feel justified in giving it full credit in respect to amounts paid Turkovich for the remaining months. This letter of October 1 simply produces a conflict in the evidence as to Turkovich's receipts under the written contracts. The commission evidently accepted Turkovich's testimony upon that issue and we are bound by its finding.

Some stress is laid by the company upon the fact that prior to the time Turkovich entered its employ as a tie maker, it had operated under written contracts similar to those employed by it and under which Turkovich was working at the time of his injury. We are unable to perceive how that fact

can have any particular bearing upon its relations with Turkovich. ▮ It makes the further point that it changed its plan of operations from the relation of employer and employee to that set forth in the written contract for reasons other than to avoid the benefits and privileges that the law now accords to an employee. It undoubtedly had these latter in mind, as its representative informed Turkovich that under the newly adopted plan, the company would not be liable for either hospital privileges, social security or workmen's compensation. The reason for the change of plan is in no way controlling, for if under the new plan the status of employer and employee still continued, the reason for adopting the written contract plan is not material. ▮ The written contract under which Turkovich was operating at the time of his injury was prepared entirely by the company, and, therefore, according to the well established rule of construction, is to be construed in favor of Turkovich and against the company. *(Laidlaw* v. *Marye,* 133 Cal. 170 [65 P. 391].) Furthermore, the provisions of the Labor Code are to be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment. (Sec. 3202, Lab. Code.) (See, also, *Liptak* v. *Industrial Acc. Com.,* 200 Cal. 39 [251 P. 635] ; *Harris* v. *Industrial Acc. Com.,* 204 Cal. 432 [268 P. 902] ; *LaFranchi* v. *Industrial Acc. Com.,* 213 Cal. 675 [3 P.2d 305].)

▮ The commission under the facts before it found that Turkovich was an employee of the company at the time of his injury, and that the injury sustained by him arose out of and in the course of his employment. Whether Turkovich was an employee or not was a question of fact for the determination of the commission. *(Schaller* v. *Industrial Acc. Com.,* 11 Cal.2d 46, 51 [77 P.2d 836].) In reviewing the findings of the commission, the courts are without power to disturb them unless there is a lack of substantial evidence. The courts are not concerned with conflicts. *(Associated Indem. Corp.* v. *Industrial Acc. Com.,* 18 Cal.2d 40, 42 [112 P.2d 615].) ▮ Where there is substantial evidence to support the findings and order of the commission, the reviewing court may not substitute its views for those of the commission and annul the award. *(Morris* v. *Industrial Acc. Com.,* 40 Cal.-App.2d 94 [104 P.2d 408].) ▮ If the findings of the Indus-

trial Accident Commission are supported by inferences which may fairly be drawn from evidence, even though the evidence is susceptible of opposing inferences, the reviewing court will not disturb the award. (*Schaller* v. *Industrial Acc. Com., supra.*)

In view of these authorities as applied to the evidence before the commission, we are of the opinion that the commission was justified in finding that Turkovich was an employee of the company at the time of his injury. Accordingly, the award in his favor should be affirmed and it is so ordered.

Gibson, C. J., Shenk, J., Carter, J., and Traynor, J., concurred.

SCHAUER, J.—I dissent. I recognize the social desirability of reaching the conclusion declared in the majority opinion insofar as some of the ends to be thereby attained are concerned, but am, regretfully, unable to join the majority of the members of this court in their view of the factual record in such a quantity of its aspects as to make it impossible for me to reach their conclusion. It therefore becomes necessary for me to set out my own impression of a fair and accurate portrayal of the factual record as well as my conclusion of law.

The primary question involved in this proceeding is the sufficiency of the evidence to support the critical finding (or conclusion) of the commission that the applicant, Turkovich, at the time of his injury, was an "employee"; i. e., was "in the service" of petitioner. (See definitions of "employer" and "employee" as stated in sections 3300(c) and 3351, respectively, of the Labor Code.) This primary question is to be considered in the light of another finding of the commission; viz., that "At the time of [the injury] . . . applicant was working for Pacific Lumber Company *under the terms of a 'Conditional Sales Agreement'.*" (Italics added.) Also very definitely involved, in any realistic view of the case, is a question as to whether parties may make and be protected in the integrity of lawful contracts or whether the Industrial Accident Commission and this court shall examine a contract which the parties are found to have made, and being dissatisfied with

its terms, although lawful and free from fraud and conceal-
ment, rewrite the contract to effect a substantial change in
the relationship of the parties and enforce it as rewritten.

It appears without dispute that Turkovich received the
injuries while working as a split products maker on June
21, 1941, at Redcrest, California, on timberland owned by
petitioner; that the work consisted of felling trees, cutting
them into logs and splitting the logs into ties, fence posts,
etc., known as "split products"; and that approximately
four and one-half years prior to the date the injuries were
received Turkovich had been orally employed by petitioner,
through the agency of its employee, one P. B. Skiffington,
as a tie maker, had thereafter, during the period of employ-
ment, received his pay every two weeks on an agreed piece-
work basis, and incident to such employment had received
social security and hospital benefits. This arrangement con-
tinued until the fall of 1940, at which time the same Mr.
Skiffington, who was in charge of the split products depart-
ment of petitioner company, informed Turkovich that the
company was inaugurating a "new system," that Turkovich
would thenceforth be "on his own," and that hospital and
social security benefits would cease. Skiffington then pre-
sented and Turkovich thereupon signed a contract which pur-
ported to effect a conditional sale to Turkovich by the com-
pany of certain specified trees on the company's timberland,
which Turkovich was to convert into split products. There-
after the parties entered into at least three additional con-
tracts, all identical with the first contract except for dates
and trees sold. It was on trees covered by a contract dated
March 18, 1941, that Turkovich was working at the time of
his injury on June 21, 1941.

Although a written contract, unambiguous in terms, does
not conclusively establish the relationship between the con-
tracting parties in a proceeding before the Industrial Acci-
dent Commission wherein it is sought to show that the true
relationship of such parties, contrary to that purportedly
established by the contract, is that of employer and employee,
it is nevertheless prima facie proof of the relationship it pur-
ports to establish and must prevail unless the circumstances
under which it was made and the subsequent conduct of each
party, known to and acquiesced in by the other, show that a
different relationship existed at the time the injuries were

received. (See *Luckie* v. *Diamond Coal Co.* (1919), 41 Cal.App. 468, 479 [183 P. 178]; *Carlson* v. *Industrial Acc. Com.* (1931), 213 Cal. 287, 290 [2 P.2d 151].) Here the contract involved is unambiguous in its terms, and the commission found that *the applicant was working under those terms*. Under its terms Turkovich clearly was neither an employee nor an independent contractor; he was an independent operator. Such finding of the commission appears, then, on its face, to be determinative of this litigation. The commission, however, received in evidence not only the contract under which the parties were operating at the time of Turkovich's injury but also proof of the execution of previous contracts between them, proof of a prior employee-employer relationship, and proof of the circumstances under which the several contracts were executed and performed, and upon all of this evidence also found or concluded that Turkovich was an employee of petitioner at the time of the injury. Hence, it becomes proper to examine all of the evidence to ascertain whether the commission's conclusion as to the employee-employer relationship can be sustained, notwithstanding its express finding as to the contractual relationship.

The contract here involved provided, in material part, as follows:

"1. Seller hereby agrees to sell the redwood trees or strips or groups of redwood trees . . . designated . . . to Buyer at and for the price of Seven and 50/100 dollars ($7.50) per thousand board feet on the basis of board measure content of such timber suitable for manufacture by Buyer [Turkovich] of . . . redwood split products (the decision of Seller's [petitioner's] representative as to such suitability and measure to be conclusive on both parties hereto), and Seller hereby grants to Buyer a limited license of ingress into and egress from and occupancy of the portions of the real estate hereinabove described solely for the purpose of cutting said timber, so marked and designated, manufacturing or reducing the same into such redwood split products, storing such products *and removing the same for sale and delivery elsewhere* [Italics added.] . . . ; provided that this agreement is upon the condition that Buyer shall begin to cut or cause to be cut said timber so marked and designated on or before . . . [specified

date] and shall have completed all of the cutting, reducing, manufacture, storage and removal of the resulting redwood split products herein referred to from the premises hereinabove described not later than [specified date] . . .

"2. All of the . . . operations herein provided for are to be at the sole cost and expense of Buyer and Seller is to be under no obligation to furnish any tools, appliances, facilities or materials necessary for any of said operations.

"3. Payment by Buyer to Seller of the purchase price of said . . . timber at the rate hereinabove specified shall be made as follows:

"On the 1st and 16th day of each month, or at such other times as mutually agreed upon between Buyer and Seller.

"4. Buyer agrees to take all necessary precautions for the prevention of fires, and to comply with all public laws and regulations relating to said real property and the work to be performed by him hereunder.

"5. Seller may at all reasonable times send inspectors on the premises in order to determine whether or not Buyer's operations are being conducted in a wasteful manner or are unnecessarily wasteful and destructive of the timber or the real property on which it is located. Buyer agrees to abstain from any practice which in the judgment of the Seller or its inspectors is wasteful or destructive. For the purpose of preventing unnecessary waste Seller shall have the right to demand that all portions of each tree suitable for manufacture into split stock products be so utilized by Buyer.

"6. Buyer further agrees to indemnify and hold Seller harmless of and from all liability, cost, or expense of every kind or nature which Seller may suffer or incur on account of or in connection with any damage to property, or injuries to or death of persons which relate to or result from the carrying out of this agreement by Buyer.

"7. Buyer agrees to remove from the real property, leaving the same in as good condition as it was at the time he went upon it for the purpose of performing this agreement, reasonable wear and tear and the changes incident to the carrying out of this agreement excepted.

"8. This agreement, or any right thereunder, may be assigned by the Seller but shall not be assignable by the Buyer without the consent of the Seller.

"9. Title to and ownership of said . . . timber, . . . and of

all of the products into which the same is converted by Buyer, shall remain . . . in Seller until the purchaser has fully paid the purchase price . . .; provided that Buyer shall have the right to have vested in him or his assigns the title to such portions of said timber in lots of not less than One Thousand (1000) feet, board measure, upon payment at the rate hereinabove specified of the purchase price thereof; and provided, further, that the entire purchase price for all of said . . . timber shall be paid by Buyer to Seller not later than said . . . [specified date], on or before which . . . Buyer must have completed all of his operations hereunder.''

It further appears that although Turkovich was told by Skiffington that the trees designated in the contracts were his (Turkovich's) trees and he could sell the products thereof to whomever he wished, petitioner company actually purchased all of such products, paying Turkovich therefor by check at such times as he made delivery; that no deductions for unemployment insurance, social security, or hospital benefits were made from such checks; that Turkovich paid no money to petitioner for the trees "sold" to him under the contracts, but, instead, received from petitioner the difference between the price specified in the contracts and the price at which petitioner purchased the split products from him; that both before and under the contracts Turkovich furnished his own tools, and petitioner company came to get the split products at its own convenience, but, while the operations were under the contract system, as often as Turkovich announced that he was ready to make delivery of finished products.

Turkovich testified that he was fifty-nine years old; that he was against signing the contracts, but that he signed because of the difficulty of getting other work at his age; that Skiffington told him the company "got kind of new system, . . . kind of contract" and that there would be no more hospital or social security benefits. He further testified that he knew he had been protected by the Workmen's Compensation Law before the contracts and that nothing was said about workmen's compensation when Skiffington told him about the new system; that he did the same work under the contracts as he had done for the company before; that before the contracts he was not told what trees to cut, but under them he could cut only the designated trees, in the selection of which he participated with Skiffington and which were

thereupon marked with his identification symbol; that he "never refused" a tree but cut it down and left it "if I can't make nothing out of it"; that before the contracts Skiffington told him what kind of stock or split product to make, but under the contracts he was not told "anything"; that both before and during the contracts Skiffington told him "where to work," his total hours of work were approximately the same, and he went to work when he felt like it and when the weather permitted; that before the contracts Skiffington had told him he should not work more than 40 hours a week, but after he signed the first contract he received no further instructions as to his hours of work; that nobody told him how to do his work because "I am old tie maker, nobody can tell me about that"; that he made about the same amount of money under the contracts as before he signed them.

A report of petitioner company, furnished at the request of the commission, showed that Turkovich's average earnings were $102.41 per month during his last year as petitioner's acknowledged employee, but that it had paid him, *after deducting the price of trees he purchased*, a net average of $193.65 per month under the contracts. This was his average monthly earning or profit derived from petitioner for the entire calendar period subsequent to termination of the original employee relationship despite two intervals between contracts when he apparently had no business connection with petitioner. The accuracy of this report was not challenged at the oral argument and should be accepted by us as true for what it purports to establish. The "Trade Ledger Account," referred to in the majority opinion, does not purport to show the conditional sale contracts accounts.

Derby Bendorf, an industrial engineer employed by petitioner company, testified that prior to March, 1937, the company considered its split stock workers to be independent contractors, made no hospital benefit deductions from their pay checks, and gave them no "continuous service bonuses" such as were received by regular employees of the company; that in March, 1937, such workers were required to take the regular company physical examination and those who passed were taken on as employees and continued in that status for approximately three years, receiving hospital benefits and service bonuses; that because of the difficulty of checking on the working hours of the men in the woods in order to comply

with the Federal Wages and Hours Act (officially designated as the Fair Labor Standards Act [29 U.S.C.A., ch. 8], which became effective in 1938) the company decided in about April, 1940, to change over to "the selling of the timber to purchasers, who make the stock for themselves"; that thereafter the company "did away with the physical examination, and we did away with any hiring cards, and we discontinued the hospital deductions, and also the continuous service plan was abandoned; in other words, we abandoned all of the employee relationship"; that the company no longer kept records of the men's working hours; that the men were not instructed that they "were not to resell their products to anyone except Pacific Lumber Company"; that it was common for split products workers to sell their products to third parties; that he could (and he did) name one split products operator, working on petitioner's land, who sold his manufactured product to a buyer other than Pacific Lumber Company; that petitioner company purchased split products from workers not working on petitioner's own land (this fact was established by stipulation); that payment to the company by the purchasers of the timber was made "as it is cut out, on a depletion basis or on a finished product basis"; and that the only supervision exercised by the company over the workers on its land was to see that timber was not unnecessarily destroyed or wasted. None of the foregoing epitomized testimony was denied.

Patrick Skiffington, in charge of the split products department of petitioner company, testified that certain of the conditional sale contracts for timber were made by the company with individuals and others with partnerships; that the buyers were free to and occasionally did hire men to help them in the work, paying such men themselves: that after the contracts were entered into no effort was made to keep a record of the men's time; that Turkovich was given no instructions as to what kind of split products he should make, although from time to time he was informed that the company was in the market for some specified product and Turkovich would then manufacture it, and that Turkovich was free to make whatever his trees were suitable for; that before the contracts were signed the company occasionally "fired" certain of the split products workers, but that it had never attempted to terminate any of the work under any contract until the con-

tract expired; that the men, including Turkovich, chose the trees they wished to work under the contracts; that before the contract system was inaugurated Skiffington assigned the men, including Turkovich, a strip of trees and they worked the whole strip rather than, as under the contracts, individual trees.

Charles R. Barnum, a real estate broker from the community in which Turkovich worked, testified that he was familiar with the practices of the local lumber companies in selling their timber to split products makers; that ordinarily a contract was entered into requiring only a small, if any, down payment to the company with the balance of the payments being made upon sale of the finished products; that it was customary for the company to see that the manufacturing was efficiently done so that "all possible can be got out"; that the price received by the company for its trees was in many cases "determined by footage received, if the claim is on a yield basis"; that usually the companies retained title to the finished product until they had received payment for the trees; that when the split products worker sold his products he would commonly direct that payment therefor be made to the seller of the trees, who would then deduct the price of the trees and remit the balance to the worker; that it was not usual in such cases for the company to secure workmen's compensation insurance on the buyer of the timber, or to specify or keep track of the buyer's hours of work; that he had been acquainted with this practice for the past 11 years and it had "been going on for a long time ahead of my time."

The commission found that: "1. John Turkovich, while employed as a tie maker on June 21, 1941, . . . by Pacific Lumber Company, sustained injury arising out of and in the course of aforesaid employment . . .

"2. At the time of aforesaid injury, applicant was working for Pacific Lumber Company *under the terms of a "Conditional Sales Agreement.'* The terms of said 'Conditional Sales Agreement' are not sufficient to constitute applicant an independent operator or independent contractor at the time of said injury." (Italics added.)

In *Burlingham* v. *Gray* (1943), *ante,* pp. 87, 99-100 [137 P.2d 9], the rules for determining whether one rendering serv-

ice to an employer is an employee or an independent contractor are assembled and authorities in support thereof are set forth. Such rules may be summarized as follows: An independent contractor is one who renders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished, whereas the relationship of employer and employee exists whenever the employer retains the right to control or direct how the work shall be done as well as the result to be accomplished. One means of ascertaining whether or not the right to control exists is the determination of whether, if instructions were given, they would have to be obeyed. A strong factor tending to show the relationship of an employee is the employer's right to terminate the work at his pleasure. Neither the manner of payment nor the choosing by the employee of his own hours of work is conclusive of the relationship.

In determining that Turkovich was injured while "employed . . . by Pacific Lumber Company" I recognize that the commission was entitled to consider evidence showing "the inception of the agreement, the understanding of its purport by . . . the . . . parties concerned with it, and the practical construction thereof by such parties in their subsequent acts." (*Carlson* v. *Industrial Acc. Com.* (1931), *supra,* 213 Cal. 287, 289-290 [2 P.2d 151] ; see *S. A. Gerrard Co.* v. *Industrial Acc. Com.* (1941), 17 Cal.2d 411, 414 [110 P.2d 377].) For that reason it has been necessary to review the evidence in all its material entirety, as above set forth. It is also true that it is only where such evidence, coupled with reasonable inferences therefrom, offers no support to the findings of the commission that the award may be annulled. (*Carlson* v. *Industrial Acc. Com., supra; La Franchi* v. *Industrial Acc. Com.* (1931), 213 Cal. 675, 676 [3 P.2d 305] ; *Murray* v. *Industrial Acc. Com.* (1932), 216 Cal. 340, 345 [14 P.2d 301] ; *S. A. Gerrard Co.* v. *Industrial Acc. Com., supra.)* "Whether a workman is an employee within the Workmen's Compensation Act or an independent contractor [the same principle would apply to an independent *operator*] is a question of fact upon which the judgment of the Industrial Accident Commission is conclusive where the facts are in dispute, and becomes a question of law only when but one inference can reasonably be drawn from the facts." *(Roman Catholic Archbishop* v. *Industrial*

*Acc. Com.* (1924), 194 Cal. 660, 667-668 [230 P. 1].) But neither the Industrial Accident Commission nor this court may arbitrarily disregard undisputed evidence and only fair and reasonable inferences should be drawn.

I find no substantial conflict in the evidence in the record establishing the relationship between Turkovich and petitioner company. The established facts appear to me to require the conclusion that Turkovich was not "in the service" of the company as either an employee or an independent contractor, but was, instead, an independent operator. His hours of work were of his own choosing; he could employ such assistants as he wished; his products were purchased by petitioner company because he chose to sell to it as well as because it wished to buy them; he was paid for such products whenever he chose to make delivery of them; he was free to make such products as he wished and to dispose of them to whomever he pleased, subject only to the company's "right [under the contract] to demand that all portions of each tree suitable for manufacture into split stock products be so utilized," and provided that the company received the contract price for the trees sold. The only control or *right* to control retained by the company over Turkovich was the contract provision just quoted, and that control, even if Turkovich could be said to have been performing service for the company, would obviously relate only to the results of the work, and not to the means of its accomplishment. It would tend, therefore, to make him an independent contractor but not an employee. The reservation by the company (as security) of title to the trees sold, as well as the right to inspect the premises to protect itself from wasteful destruction of the timber, constituted no such control over Turkovich or his work as to render him its employee, but, as pointed out by petitioner, simply limited Turkovich's use of petitioner's own property.

Perhaps the most plausible argument that has been advanced in favor of respondent's finding is the suggestion that admittedly, immediately prior to the inauguration of the conditional-sale-contract system, Turkovich was an employee "in the service" of petitioner; that the service rendered consisted in his felling trees belonging to petitioner and in converting them into split products so that petitioner could market such products; that under the contract system the same result was

accomplished and, hence, that he continued to render the same service. But the flaw in any pertinent syllogism which can be constructed out of such propositions is the fact that one can render service to another without necessarily being "in his service" as an employee. Under our constitutional system of government the freedom of contract, subject to reasonable regulation, is guaranteed. There was more than one lawful method by which petitioner could market its trees. It could sell the land with the trees standing, it could retain the land and employ men to fell its trees and convert them into lumber products for *its own account,* or it could sell the trees, standing or fallen, to another person to convert into lumber products for *his* account. In the open market it could bid for such products. The fact that in the competition for purchase of such products it might have had the advantage of some establishment or organization in proximity to the place of manufacture, fails to change the quiddities of the transaction. Upon the contract which the respondent commission specifically found that Turkovich and petitioner were operating under, *Turkovich was free to sell his products to whomever he wished.* Hence, in manufacturing them he was acting *in his own service* and not in the service of petitioner. The fact that petitioner's interest also was served by the transaction is but incidental; it is not to be expected that in a free country an owner will sell his property (or a workman his services) unless his interest is thereby served.

There is nothing in the record which justifies the conclusion that the contract system was but a subterfuge to conceal an actual employee relationship. It is undisputed that that system was an old, established business procedure which had been in common usage in the district for many years. Upon the facts as reflected in this record, and the law as now constituted, we cannot consistently hold that petitioner and Turkovich were not free to make the contracts they made.

I hasten to emphasize that the freedom of contract is not absolute but is subject to laws protecting the weak against the strong (see *Chicago B. & Q. R. Co.* v. *McGuire* (1911), 219 U.S. 549, 567 [31 S.Ct. 259, 55 L.Ed. 328, 338]; *Max Factor & Co.* v. *Kunsman* (1936), 5 Cal.2d 446, 458-462 [55 P.2d 177]; *People* v. *McEntyre* (1938), 32 Cal.App.2dSupp. 752, 754-755 [84 P.2d 560]; *State etc. Bur.* v. *Pomona etc. Assn.* (1940), 37 Cal.App.2dSupp. 765, 770 [98 P.2d 829]).

Social progress may well demand that men engaged in independent operations of the type depicted here be protected by some adequate form of insurance, but the absence of or need for laws covering such situations does not give us authority to engraft onto the Labor Code a provision creating and placing on one person liability for the misfortune of another who is not his employee, even though the former was being benefited incidentally by the independent operations of the latter.

Upon the record here, even if we could properly hold that Turkovich was "in the service" of petitioner at the time of the injury, it should avail him nothing as, under heretofore recognized principles, he would be, at best, an independent contractor rendering "service for a specified recompense for a specified result, under the control of his principal *as to the result of his work only* and not as to the means by which such result is accomplished." (Italics added.) (Labor Code, sec. 3353; see, also, for rules governing the determination of what constitutes an independent contractor, *Burlingham* v. *Gray* (1943), *supra, ante,* pp. 87, 99-100 [137 P.2d 9].) As an independent contractor he would not be entitled to workmen's compensation under the Labor Code.

Respondent argues that the contract in this case is comparable to purported written "leases" involved in *Carlson* v. *Industrial Acc. Com.* (1931), *supra,* 213 Cal. 287 [2 P.2d 151], and *S. A. Gerrard Co.* v. *Industrial Acc. Com.* (1941), *supra,* 17 Cal.2d 411 [110 P.2d 377], in each of which this court affirmed the commission's award in favor of the claimed employee. In the Carlson case both the "lease" and the interpretation thereof by the parties demonstrated such an extensive right of control reserved in the "lessor" of ranch property over the work of the "lessee" as to establish an employment relationship. In the Gerrard case the "lease" itself was found to have given the "lessee" of farm lands (p. 414 of 17 Cal.2d) "no right to do anything with the . . . crop, from planting to sale," without consent of the "lessor," and to have constituted the "lessee" an employee. Neither of those cases constitutes authority for affirmance of the award here.

Lastly, and as previously noted, the commission specifically found that "At the time of aforesaid injury applicant was working . . . *under the terms of a 'Conditional Sales Agreement'.*" (Italics added.) The terms of that agreement, as

hereinabove set forth, are unambiguous and clearly create a relationship other than that of employee-employer. The conclusion of the commission with respect to that agreement, *in the light of all the evidence above narrated,* is *not* that it was a subterfuge or that it was procured by fraud or deceit. Neither does it find that such agreement failed to state the true contract of the parties. It merely concludes *as a matter of law* that "The *terms* of said '. . . Agreement' are not sufficient to constitute applicant an independent operator or independent contractor," (Italics added) and *in the light of such conclusion of law* on its part finds that applicant was an employee of petitioner. If we were to assume a jury trial, an instruction of the court that "The terms of said '. . . Agreement' are not sufficient to constitute applicant an independent operator or independent contractor," a special verdict that the parties were operating under the agreement, and a general verdict based implicitly on a finding that the employee-employer relationship existed, I think there should be no hesitancy in reversing the judgment. That is the case we have here.

The award should be annulled.

Edmonds, J., concurred.

Petitioner's application for a rehearing was denied August 5, 1943. Edmonds, J., and Schauer, J., voted for a rehearing.