[Civ. No. 3163. Fourth Dist. Oct. 13, 1944.]

CENTRAL CALIFORNIA ICE COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and S. E. MONTGOMERY, Respondents.

McFadzean & Crowe for Petitioner.

Everett A. Corten, R. C. McKellips and J. A. Chase for Respondents.

MARKS, J.—The Central California Ice Company, the employer, brought this proceeding to review an award of the

Industrial Accident Commission to S. E. Montgomery, the employee, of $12.50 per week based on the finding of serious and wilful misconduct of the employer. No question is raised as to the award of $25 per week made in the usual course for the injuries received by the employee.

The commission found serious and wilful misconduct of the employer in two particulars: First, in the use of a chute to load ice from a loading platform onto the floor of the body of a truck being loaded; second, loading 36 cakes of ice on the truck, which, in the opinion of the commission, did not leave "the employee engaged in loading said truck a reasonable and safe amount of space in the rear of the bed of said truck on which to step or stand while engaged in loading operations."

Petitioner is a California corporation engaged in the manufacture, distribution and sale of ice. The accident happened at its manufacturing plant in Visalia while loading a Chevrolet one and one-half ton truck with ice for delivery to Exeter.

J. J. Doherty was manager of the Visalia plant as well as of several distributing plants of petitioner in Tulare County. He had been connected with the ice business for twenty-two years and was familiar with the operation of such plants from Modesto to Kern County. Fred Le Cuyre was chief engineer of the Visalia plant and had charge of the operation in that plant starting with the manufacturing of the ice and continuing until the cakes were run through a scoring machine preparatory to delivery to retail distributing trucks or for transportation in service trucks to central points of distribution.

S. E. Montgomery was hired by Doherty. His chief duties were to assist Le Cuyre in the plant. Occasionally he loaded and operated a service truck.

A block of ice weighs 320 pounds. It is 38 to 40 inches long, 26 inches wide and 10 inches thick on one end and 11 inches thick on the other.

When loaded on a service truck the cakes of ice are placed in rows across the truck. The limit of the capacity of the Chevrolet truck being loaded was 36 cakes which left five inches of the bed protruding to the rear of the rear row of ice cakes. Each row of cakes occupied about 11 inches of the longer dimension of the truck so if only 30 cakes had been loaded, which respondents maintain was the prudent load for

such a service truck, about 27 inches of the bed would have protruded beyond the rear row of cakes.

The chute used in loading the truck was 7 feet, 11 inches long, with an 18-inch runway with rails on both sides, making its exterior width about 22 inches. It had steel spikes or something similar on each end to keep it from slipping when in use. The proper loading practice when using the chute was to take each cake of ice on a loading platform as it came from the scoring machine, end it up, and slide it down the chute to the bed of the truck and then move it into its proper position. Ice tongs were used by the loader in this operation.

Petitioner had several service trucks in use, the beds of which were not of uniform height above the ground. As each truck received its load its springs were depressed while the position of the loading platform remained stationary. Evidence indicates that beds of some of the unloaded trucks were three or four inches above the loading platform and were depressed three or four inches below its level when loaded. The chute was used to compensate these differences in height so that the loader would not have to lift the 320-pound cake of ice up from the platform when the loading started and lower the cake to the truck bed as loading was being completed. Evidence is undisputed to the effect that scored cakes of ice break easily and that such cakes could not be dropped three or four inches from the loading platform to the truck bed without the probability of their breaking. There is also undisputed evidence to the effect that practically all of the injuries to workmen loading ice come from strains when they endeavor to lift heavy cakes either in raising them from the loading platform to the truck beds or lowering them from the loading platform to the depressed truck beds.

There is also undisputed evidence to the effect that the loading operations we have just described had been in use at the Visalia plant for many years and were generally employed in practically all plants operating in the Central San Joaquin Valley; that no accident identical with the one involved here in loading a service truck was known to have happened in that valley or elsewhere.

There is also undisputed evidence that safety engineers of the Industrial Accident Commission inspected the Visalia plant at least once each year and sometimes oftener; that they had observed these loading operations where 36 cakes of ice

were loaded onto trucks by means of a chute; that they never regarded the operation as sufficiently dangerous to issue any directive concerning it nor to make any comment upon it although they had corrected other practices which they regarded as unsafe.

After the outbreak of the war the Office of Defense Transportation issued its General Order Number 17, section 501.69 of which provided as follows: "Loading and Operating Requirements: (a) No motor carrier shall operate any motor truck in over-the-road service unless it is loaded to capacity, except as follows: . . ." (None of the exceptions are applicable here.)

Section 4553 of the Labor Code provides that: "The amount of compensation otherwise recoverable shall be increased one-half where the employee is injured by reason of the serious and wilful misconduct of any of the following: . . . (c) If the employer is a corporation, on the part of an executive, managing officer, or general superintendent thereof," provided that such increase shall not exceed $2,500.

Section 11661 of the Insurance Code prohibits an insurance carrier from insuring against liability arising from the serious and wilful misconduct of an employer.

Petitioner is a corporation and J. J. Doherty was general superintendent of its plants in Tulare County. The sole question to be determined here is whether there is any evidence supporting the finding of the commission that petitioner was guilty of serious and wilful misconduct in loading its truck to its capacity of 36 cakes of ice or in using the chute in its loading operations. This must be measured by the knowledge or neglect of Doherty concerning the acts or omissions found to be wilful misconduct. Complaints made to other employees of petitioner who were neither an executive, managing officer nor general superintendent thereof can have no bearing on the case unless they were communicated to Doherty.

It is admitted that Doherty directed the loading of the trucks to their capacity of 36 cakes of ice and knew of and approved the use of the loading chute. Therefore, knowledge of these things and responsibility therefor, if any, is chargeable to petitioner under the terms of the statute.

Whether practices used amount to serious and wilful misconduct usually depend on the facts of each case and the

burden of establishing serious and wilful misconduct on the part of the employer rests on the injured employee. Here the question of serious and wilful misconduct insofar as the probability of injury to the employee is concerned must be determined from those things known or that should have been known up to the time of the accident involved here because "serious and wilful misconduct is conduct that the employer knew, or should have known, was likely to cause serious injury, or conduct that evinces a reckless disregard for the safety of others." (*Parkhurst* v. *Industrial Acc. Com.*, 20 Cal.2d 826 [129 P.2d 113].) (See, also, *Hatheway* v. *Industrial Acc. Com.*, 13 Cal.2d 377 [90 P.2d 68].)

The same rule was announced in somewhat more detail in *Dawson* v. *Industrial Acc. Com.*, 54 Cal.App.2d 594 [129 P.2d 479], as follows:

"It will be observed that the misconduct on the part of the employer which will justify an increase of compensation provided for by section 4553 of the Labor Code must be both 'serious and wilful.' The term 'wilful misconduct,' as it is used in that section, involves the same sort of dereliction of duty as that on the part of the driver of an automobile which authorizes an individual to recover damages for personal injuries sustained while riding as a guest in the machine of another person, under section 403 of the Vehicle Code. In the case of *Norton* v. *Puter*, 138 Cal.App. 253 [32 P.2d 172], at page 258, that term is defined as follows:

" 'Wilful misconduct depends upon the facts of a particular case and necessarily involves deliberate, intentional or wanton conduct in doing or omitting to perform acts, with knowledge or appreciation of the fact, on the part of the culpable person, that danger is likely to result therefrom. [Citing numerous authorities.]'

"The preceding definition is approved by the Supreme Court in the case of *Porter* v. *Hofman*, 12 Cal.2d 445 [85 P.2d 447], at page 447."

 Respondents point to several conversations between Montgomery and Le Cuyre in which Le Cuyre was told that the use of the chute and the practice of loading 36 cakes of ice on the truck was dangerous. There is no evidence that any of these complaints were ever communicated to Doherty or any other responsible officer of petitioner. They cannot sustain the finding of serious and wilful misconduct because Le

Cuyre was neither "an executive, managing officer, or general superintendent of the employer corporation." (Lab. Code, § 4553.) This also applies to persons or employees of petitioner, other than Doherty, who were supposed to have made or heard similar statements.

Respondents also point to other evidence to the effect that the use of the chute in loading ice may have been discontinued to a considerable extent after the accident because it might have been considered as dangerous. What was done after the accident can have little bearing on this case. As was remarked by the referee who took testimony in this case: "And that is the nature of an accident, something unforeseen happens; perhaps even cautious people could not foresee it; then their hindsight becomes sharpened and they can see it, and then they change it."

The only evidence in the record pointing to knowledge of Doherty that the use of the chute was dangerous, is in the following testimony of Montgomery: "He just made the remark, 'It looks like that chute is useless. Besides it is dangerous.' "

The only accident that had happened when a chute was being used, other than the one involved here, was described by Montgomery. It happened in Exeter while Doherty was unloading ice from a truck. It appears from the testimony of both Montgomery and Doherty that it happened when the ice tongs being used by Doherty slipped from the cake of ice he was attempting to unload so the circumstances of that accident are not similar to the one involved here. There is no intimation in this instance that the ice tongs being used by Montgomery slipped and caused him to fall.

Doherty had been connected with the ice business in the San Joaquin Valley for twenty-two years. The use of similar chutes was the almost universal practice in the ice industry there. So far as known no similar accident had occurred there in those twenty-two years. Inspectors of the Industrial Accident Commission had seen trucks loaded to their capacity by means of a chute. It was part of their duty to look for conditions creating a danger to employees. These inspectors neither criticized the use of a chute in loading ice nor loading 36 cakes on a truck although they had ordered corrected other conditions which they considered hazardous. Although empowered so to do if it considered the use of the

chute or loading to the capacity of 36 cakes to be dangerous, the commission issued no safety order on these subjects and it made no criticism of these practices, either written or verbal.

If these practices did not appear dangerous to the safety engineers of the commission who had the duty to perform of correcting hazardous practices, can it be said that the petitioner through Doherty should have known that the use of the chute or loading the truck to capacity was likely to result in injury to an employee? We think not, especially in view of the fact that no like accident had happened before in the ice industry. ▉ It is not enough to prove negligence or even gross negligence on the part of the employer in order to fasten the added liability on it. In addition there must be a wilful disregard of consequences with injury to the employee as a probable result.

▉ It seems to us that there were hazards which were inherent in the occupation and which were shared by all engaged in it. The ice cakes weighed 320 pounds. Ice melts. This is a natural phenomenon and a wet loading platform and truck bed necessarily follow therefrom. Wet wood is more or less slippery. These conditions are all inherent in the work in which Montgomery and all the others similarly employed were engaged. If, in stepping from the chute onto the bed of the truck, he had placed his foot too near its rear edge, the danger of slipping would have been the same no matter how much vacant space there was on the bed. Had he placed his foot firmly on the five-inch space, slipping would not have been probable. It is rather clear that his fall was caused by his own act in placing his foot too close to the rear edge of the bed of the truck rather than by any act of the employer. Serious and wilful misconduct should not be predicated on any such state of facts in the absence of a safety order covering the subject.

▉ It is also true that petitioner was required to load its trucks to their capacity by the order of the Office of Defense Transportation. Counsel for the commission argued that federal agencies had been liberal in modifying their regulations when they conflicted with the state safety regulations; that the commission had been successful in requesting and securing such modifications in other instances. As we have observed, the commission had issued no safety order on

the number of cakes of ice to be loaded on a truck. It had made no request for a modification of the rule of the Office of Defense Transportation already quoted although its inspectors were familiar with the practice of loading 36 cakes of ice on a truck. This suggests that neither the commission nor its inspectors regarded the practice involved here as dangerous. Otherwise the commission should have performed the duty imposed upon it by law and should have prohibited the practices which are now, for the first time, urged as inherently dangerous. As the commission must be charged with notice of these practices and as it failed to regard them as sufficiently dangerous to require the issuance of a safety order regulating them, as neither it nor its employees had even criticized the practices, and as no similar accident had happened in the ice industry, those practices should not be held to furnish grounds for concluding that their employment by petitioner constituted serious and wilful misconduct until the Industrial Accident Commission issues a safety order prohibiting or regulating either or both of them which is in its power to do if either practice creates a serious hazard to an employee. (*Bethlehem Steel Co.* v. *Industrial Acc. Com.*, 23 Cal.2d 659 [145 P.2d 583].)

The portion of the award under review is annulled.

Barnard, P. J., and Griffin, J., concurred.

Respondent Industrial Accident Commission's petition for a hearing by the Supreme Court was denied December 4, 1944. Carter, J., voted for a hearing.