[L. A. No. 19329.   In Bank.   Jan. 29, 1946.]

CALIFORNIA SHIPBUILDING CORPORATION (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and RAYMOND L. BAKER, Respondents.

Thelen, Marrin, Johnson & Bridges, and Gardiner Johnson for Petitioner.

Everett A. Corten and R. C. McKellips for Respondents.

SCHAUER, J.—Petitioner, California Shipbuilding Corporation, seeks annulment of an award of increased compensation made by respondent Industrial Accident Commission in favor of respondent Raymond L. Baker. The award is based upon the proposition declared by section 4553 of the Labor Code, that ''The amount of compensation otherwise recoverable shall be increased one-half where the employee is injured by reason of the serious and wilful misconduct of any of the following: . . . (c) If the employer is a corporation, on the part of an executive, managing officer, or general superintendent thereof.'' The commission found that the injury to Baker ''was proximately caused by the serious and wilful misconduct of the employer in that a proper guardrail [around a vent hole] was not provided for the protection of employees in accordance with Section 1827 of the Ship and Boat Building Safety Orders of the Industrial Accident Commission.'' Petitioner contends that it was not shown that the misconduct which caused the injury was on the part of an executive, managing officer, or general superintendent of petitioner corporation; that the omission to guard the vent hole was a temporary condition not chargeable to petitioner; and that it was denied procedural due process by respondent commission's action on its petition for rehearing. We have concluded that such contentions cannot be sustained.

Section 1827 of the Ship and Boat Building Safety Orders requires that ''each manhole, tank top opening, [etc.] . . . shall be provided with a guard that will not have to be removed to give access to or through the hole. These guards shall be kept in place.'' It was stipulated that petitioner had knowledge of the safety order.

Baker was injured when he stepped through an unguarded 16-inch vent hole (one of two such unguarded holes) in a flat (in this case a section of steel about 28 feet long and 20 feet wide, prefabricated for setting into the ship as a part of a tank top or deck) on the ship on which he was employed as a burner. The accident occurred at about 9:30 p. m. on June 23, 1943. Baker was standing on the flat, discussing a burn with a fellow worker and awaiting a call for his services.

He knew that he was near the hole. When he heard a call for a burner, he started to answer it, ''didn't take inventory,'' and stepped into the hole. Dimout regulations were in effect and the flat was so dark that the hole was not visible.

The flat had been placed at an angle by the day crew. At 4:30 p.m. the swing shift came to work. Truman Aubrey, foreman of the forepeak shipfitters on the swing shift, testified that under his direction the flat was picked up with a crane and straightened. Aubrey then observed that there were no guardrails about the two vent holes in the flat. The operation of straightening the flat was completed at about 5:30 or 6 p.m. About fifteen or twenty minutes thereafter, while it was still light, Aubrey saw one Garcia, a shipfitter, stepping into one of the holes and caught Garcia so that he did not fall. Aubrey then notified Raymond Phillips, shipwright foreman, whose duty it was to see that openings were guarded, that rails should be placed about the holes in the flat.

Phillips testified that before 8 p.m. on June 23 Aubrey notified him that guards were required for the flat. ''I sent a man down to get the guard rails. The guard rails were kept underneath the way at that time. Why they were not there at that time, I don't know, for they weren't. Then I had to send a tracer after them, and then they had to go through a lift order [for a crane] to come up there on.'' The man sent to get the guards reported that they were ''stacked up in the gantry way, waiting for a lift.'' ''The gantry crane was busy on other lifts, from my experience, and not knowing this particular one, not paying particular attention to that, but I have seen them, they couldn't come on up in one night, with the lifts they had ahead of them. . . . The cranes were all busy.'' Thereafter one Hartrider notified Phillips that ''We have got to hurry up and get something in those holes. Baker has already went in one of them.'' Phillips then obtained a guard rail from a hold of the ship and set it up over the opening where Baker had been injured. Phillips was asked, ''What was your normal procedure after a flat had been landed, to then call for the lifting up of the guard rails, so that they could be put in place?'' and answered, ''The normal procedure on that would be like you say, but I didn't follow that procedure, and there is a lot of those we couldn't find, and we are out on a very stiff schedule, and my men were usually snowed under at that time, and it

was my job to set the flat. Then, after I get the flat set, the fitters go to work on it. Up until that time, it is not very much going over it. So, when my men go up to set the flat, we take care of the rails.''

█ Baker's immediate superior, the foreman of the burners, was not connected with responsibility for the injury but the following evidence supports the implied finding that shipwright foreman Phillips was a ''managing officer, or general superintendent,'' whose omission to guard the vent holes in violation of the safety order is attributable to petitioner corporation: Aubrey testified that Phillips ''was responsible at that time for seeing that those holes were covered . . . for putting those guard rails up.'' Phillips testified that ''My job is to set every piece of steel in the boat for center line elevation, declivity, forward and aft—anything pertaining to that,'' and, as above stated, that ''we take care of the rails.'' The extent of Phillips' power of controlling and carrying on the operation of putting up guards is further indicated by the fact that, after he was notified of Baker's accident, Phillips on his own initiative and with the help of one of the men under him obtained a guard by means which conformed neither to the ''normal procedure'' nor to the procedure which he testified he followed (also, apparently, of his own initiative) when his men were ''snowed under.''

█ It thus appears that Phillips was invested with general discretionary powers of direction and control of an integrate department or division of petitioner's business, namely, compliance with section 1827 of the Ship and Boat Building Safety Orders and the setting of every piece of steel in the ship under construction on Way 5 in petitioner's Terminal Island yard. If petitioner's facilities were so limited that it could build only one ship at a time, it would be quite obvious that the person who had control over those portions of the business could properly be found, on evidence otherwise the same as that here presented, to be a managing officer or general superintendent. (See cases collected in *Bechtel etc. Corp.* v. *Industrial Acc. Com.* (1944), 25 Cal.2d 171, 174-176 [153 P.2d 331].) The fact that petitioner may have other ways and many employes in positions of higher rank than that of Phillips, cannot change the fact (impliedly found by the commission on sufficient evidence) that petitioner delegated to Phillips general discretionary control of a substantial unitary portion of its shipbuilding operations. (See *Vega* v. *In-*

*dustrial Acc. Com., ante,* p. 529 [165 P.2d 665].) As in *California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1944), 64 Cal.App.2d 622, 628 [149 P.2d 432], so far as appears, if Phillips was not the managing officer in immediate charge of compliance with the safety order, then no one was.

The decision of this court in *Bechtel etc. Corp.* v. *Industrial Acc. Com.* (1944), *supra,* 25 Cal.2d 171, does not, as petitioner urges, compel an annulment of this award. That decision does not purport to narrow the previous judicial interpretations of the meaning of the terms ''executive, managing officer, or general superintendent.'' The supervisory employe Sweet, whose status was there in controversy, was foreman of the crew of one truck crane only; he ''received orders all day long''; he was in charge of a single specifically designated operation but not of an integrate division of his corporate employer's business. The only evidence as to the extent of his authority tended to show that he had no general discretionary powers of direction or control of a substantial and integrate part, branch, division, or department of his employer's business. Thus he was a minor supervisory employe, as distinguished from ''an executive, managing officer, or general superintendent.''

Petitioner relies on the statement in *Central Cal. Ice Co.* v. *Industrial Acc. Com.* (1944), 66 Cal.App.2d 339, 341, 345 [152 P.2d 33], that the chief engineer who had charge of the operation of an ice plant was not an executive, managing officer, or general superintendent. Such statement was unnecessary to the decision, for the evidence did not show that the matter complained of amounted to serious and wilful misconduct, and the action of this court in denying a hearing in the case did not constitute approval of such statement. Insofar as it conflicts with our holding herein it is disapproved.

Petitioner calls to our attention the proceeding entitled *Carpenter* v. *California Shipbuilding Corp.* (1945), Ind. Acc. Com. Claim No. L. A. 76-787, wherein the supervisory employe whose status was in question was a rigger foreman of petitioner and the commission found that the applicant's injury was not proximately caused by the serious and wilful misconduct of petitioner. That the commission found for petitioner in that case does not, of course, affect our decision in this case. ▮ Where the evidence is susceptible of conflicting inferences the finding of the commission, whether for

or against the applicant, is final and it is our duty to uphold such finding.

Petitioner urges that the omission to guard the vent hole was not serious and wilful misconduct chargeable to petitioner because it was a temporary condition on a partially built ship under the constantly changing conditions of construction and because petitioner had provided the rails and Phillips had located them and was attempting to get them lifted at the time of the accident. Petitioner relies upon the language quoted in *Chain* v. *Industrial Acc. Com.* (1933), 135 Cal.App. 260, 264 [26 P.2d 856], from *Saxe Operating Corp.* v. *Industrial Acc. Com.* (1929), 197 Wis. 552 [222 N.W. 781, 782]: "In the case of a physical plant, the employer is chargeable with notice of the conditions that prevail in the plant which generally remain fixed and unchanging. But he cannot know in advance of the conditions which may be produced by the negligent or inadvertent acts of his employees." The appellate court in the Chain case did not rely on the quoted language in its stated grounds of decision (p. 267 of 135 Cal.App.)—which include "the reason that it does not appear from the evidence that there was any violation of the safety orders"—and such quoted language refers to negligence or inadvertence, not wilful misconduct. In the present case it cannot be disputed that the safety order was violated, and the evidence, as hereinafter discussed, is not as a matter of law insufficient to sustain the finding that such violation amounted to serious and wilful misconduct rather than merely to negligence or inadvertence.

Petitioner's contention that section 4553 of the Labor Code authorizes an increased award only for misconduct relating "to the physical plant of the employer, its fixed and unchanging conditions, and not to the operation of the plant or to conditions produced and constantly being changed by the acts of its employees," cannot be sustained. If it were, then employers engaged in construction work could escape liability for serious and wilful misconduct by showing that the conditions under which an injured employe worked were constantly being changed by other employes. It is apparent that the safety order here in question contemplates that the precaution of guarding holes shall keep pace with the construction of the ship. (*Cf. Hoffman* v. *Department of Industrial Relations* (1930), 209 Cal. 383, 388 [287 P. 974, 68 A.L.R. 294, 297]; *California Shipbuilding Corp.* v. *Indus-*

*trial Acc. Com.* (1944), *supra,* 64 Cal.App.2d 622, 628.) In the multiple construction of ships of the type here involved the setting of flats with open vents was in one sense not a changing condition; it was a condition which recurred in the construction of every ship.

The lack of guards no doubt was, as petitioner emphasizes, a temporary condition. But it will be remembered that there was evidence from which it could be inferred that delay in installing guards was a not unusual occurrence in relation to the regularly recurring condition requiring such guards. The testimony of shipwright foreman Phillips that his crew did not install the rails as soon as a flat was straightened and workers started to go over it, but waited until they set the flat, relates, not to the single occasion on which Baker was injured, but to procedure during a period when the workers were under the pressure of ''a very stiff schedule.'' And even though, as Phillips testified, comparatively few workers went over the flat before it was set, there were five or six men on it, exposed to the danger of the two unguarded vent holes, at the time Baker was injured. Furthermore, shipfitter foreman Aubrey testified that when he came to work at 4:30 p. m. he notified the gantry crane foreman that he wanted the flat straightened; that ''at the start of each shift, [the gantry cranes] usually have a few emergency lifts, but as soon as he got through with those, he came on up''; and that at about 5:30 or 6:00 p. m., which was twenty or twenty-five minutes after the crane first picked up the flat, the work of straightening it was completed. Shipwright foreman Phillips, on the other hand, testified that ordinarily the gantry cranes ''couldn't come on up [with the guards] in one night, with the lifts they had ahead of them.'' The commission may well have considered it significant that a crane was obtained quite promptly to straighten the flat so that workers could go over it, but not to lift the guards which should have been installed to protect such workers.

Petitioner contends that it ''has been denied procedural due process of law by the respondent commission's action in disposing of its petition for a rehearing without having considered any statement of the evidence.''

The commission, as it is authorized to do (Lab. Code, §§ 115, 5310), referred the petition for rehearing to a referee (not the referee who heard the evidence). The rehearing referee prepared and furnished the commission with a report which

briefly states the contentions of petitioner, the general facts (in the form of findings rather than a summary of the evidence) interspersed with his conclusions, and his recommendation that rehearing be denied. This report was filed by the commission with its order denying rehearing. Assuming, as petitioner asserts, that the commissioners followed their frequent practice of adopting the referee's recommendation without reading the petition for rehearing or the transcript of the evidence, such procedure did not violate due process. "When the commission adopts the facts found and the decision recommended by the one who is authorized to and does hear the evidence, then the commission is not required to review the record. An entirely different situation would be presented if the commission, disregarding and setting aside the findings and recommendation of the referee, undertook, without a review of the evidence, to appraise the same and make determinations based thereon. Such is not the case here presented." (*Taylor* v. *Industrial Acc. Com.* (1940), 38 Cal.App.2d 75, 82 [100 P.2d 511].) Similarly, the commission may properly adopt the recommendation of the rehearing referee on the basis of his report and without itself reviewing the record. (Lab. Code, § 5315; *California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1944), *supra,* 64 Cal.App.2d 622, 630, cert. den. 324 U.S. 843 [65 S.Ct. 675, 89 L.Ed. 1405].) There is nothing inconsistent in such procedure with the doctrine that "he who decides must hear," announced in *Morgan* v. *United States* (1936), 298 U.S. 468, 481 [56 S.Ct. 906, 80 L.Ed. 1288, 1295], relied upon by petitioner. The Supreme Court there pointed out (p. 479 of 298 U.S., p. 1294 of 80 L.Ed.) that "The Assistant Secretary, who had heard, assumed no responsibility for the findings or order, and the Secretary, who had not heard, did assume that responsibility."

For the reasons above stated the award is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.

EDMONDS, J.—In my opinion, the record in this case includes no substantial evidence tending to show, as stated by Mr. Justice Schauer, "that Phillips was invested with general discretionary powers of direction and control of an integrate department or division of petitioner's business." He was the "shipwright foreman, Way 5" and a part of the work

assigned to the crew working under his direction was to place rails around holes in the flats after the steel was set in place. At the time of the accident, the evidence shows, Phillips had been notified that the flat through which Baker fell was in place and that the guard rails had not been put up. He sent for rails which were not obtained before the accident occurred. The evidence, therefore, is that the crew which ordinarily set guard rails as soon as a flat was in place neglected to do so, that its foreman was notified, that he sent for the rails and that they were not installed in time to avoid Baker's fall.

These facts show that Phillips was one of the foremen in charge of a group of men constructing the ship on Way 5, but without the "general discretionary powers of direction" of the employer's business which this court has repeatedly declared is necessary in order to impose liability for serious and willful misconduct. (*Bechtel etc. Corp.* v. *Industrial Acc. Com.*, 25 Cal.2d 171 [153 P.2d 331] ; *Gordon* v. *Industrial Acc. Com.*, 199 Cal. 420 [249 P. 849] ; *E. Clemens Horst Co.* v. *Industrial Acc. Com.*, 184 Cal. 180 [193 P. 105, 16 A.L.R. 611] ; *Green* v. *Industrial Acc. Com.*, 130 Cal.App. 337 [19 P.2d 1029].) Every foreman and supervisory employee has some discretionary power of direction, but as the court specifically pointed out in the Bechtel case, "the legislature has refrained from making the employer liable for the misconduct of every person exercising authority on the employer's behalf."

Undoubtedly, at the time of the accident, there were dozens of foremen working on the ship under construction in Way 5, each charged with responsibility for seeing that certain work was performed in accordance with the directions of the employer as laid down by the General Manager and superintendent having charge of the entire activities. But the extent of the supervision of these foremen, including Phillips, was an extremely limited one. To hold that the misconduct of such a person subjects an employer to the additional liability imposed by the statute for wrongdoing, in my judgment, goes far beyond a reasonable construction of section 4553 of the Labor Code and is contrary to the rule of decision which has been stated and applied in the cases cited.