[L. A. No. 20140.   In Bank.   Dec. 30, 1947.]

CALIFORNIA SHIPBUILDING CORPORATION (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and CLEO ROGERS, Respondents.

Thelen, Marrin, Johnson & Bridges and Gardiner Johnson for Petitioner.

R. C. McKellips and John A. Rowe, Jr., for Respondents.

SCHAUER, J.—Petitioner, California Shipbuilding Corporation, seeks review and annulment of an award of increased compensation made by the Industrial Accident

Commission in favor of petitioner's employe, Cleo Rogers. Such award was made pursuant to section 4553 of the Labor Code, which provides that "The amount of compensation otherwise recoverable shall be increased one-half where the employee is injured by reason of the serious and wilful misconduct of any of the following: . . . (c) If the employer is a corporation, on the part of an executive, managing officer, or general superintendent thereof."

The commission found that Rogers' compensable injury "was proximately caused by the serious and wilful misconduct of the employer, consisting of a violation of Section 7-5050 of the Electrical Safety Orders of the Industrial Accident Commission [which forbids operation of equipment which can be brought within 6 feet of high-voltage lines] and Sections 6400 to 6403 inclusive of the Labor Code [which require that the employer furnish a safe place of employment] in that the . . . employer failed to exercise the necessary, or any care, to ascertain the location of the high-powered wires." Petitioner contends that there is no evidence to support such finding and that the finding is defective because it fails to specify the "executive, managing officer, or general superintendent" of petitioner who was guilty of serious and wilful misconduct. ▆ A finding of the ultimate fact of serious and wilful misconduct in the language of the statute is not fatally insufficient in form merely because of the generality of its language. (*Ethel D. Co.* v. *Industrial Acc. Com.* (1934), 219 Cal. 699, 708 [28 P.2d 919]; *Vega Aircraft* v. *Industrial Acc. Com.* (1946), 27 Cal.2d 529, 536 [165 P.2d 665]; *Lumbermen's Mut. Cas. Co.* v. *Industrial Acc. Com.* (1946), 29 Cal.2d 492, 499 [175 P.2d 823]; *Simpson* v. *Industrial Acc. Com.* (1927), 87 Cal.App. 652 [262 P. 469]; *Clarke* v. *Industrial Acc. Com.* (1927), 87 Cal.App. 766 [262 P. 471]; *General P. Corp.* v. *Industrial Acc. Com.* (1928), 90 Cal.App. 101 [265 P. 508].) In the cited cases the evidence presented one or two sharply defined issues of fact (e. g., whether a given act or omission did or did not constitute serious misconduct; whether a supervisory employe did or did not have general discretionary power of direction and control constituting him a managing agent), and the manner in which such issues were resolved was obvious from the general finding in favor of applicant. Similarly, in this case, the finding is readily made certain by reference to the record, for from uncontradicted testimony (hereinafter summarized) it can readily be inferred

that a managing agent or agents of petitioner were guilty of reckless disregard for the safety of other employes, including Rogers, by requiring them over a long period of time to work under obviously dangerous conditions which could have been guarded against (*Parkhurst* v. *Industrial Acc. Com.* (1942), 20 Cal.2d 826, 829 [129 P.2d 113]). Therefore, the award of increased compensation was proper.

However, as aptly stated in *Western Indemnity Co.* v. *Pillsbury* (1915), 170 Cal. 686, 705 [151 P. 398], "the practice of making specific findings will in many cases not only be fairer to the parties who may wish to seek a review of the final determination reached, but will also be helpful to the reviewing court in its effort to ascertain whether that determination may be sustained." (For a situation in which the reviewing court is seriously hampered in the performance of its duty because neither the findings nor the evidence disclose the factual theory on which the commission based its award, see *California Shipbuilding Corp.* v. *Industrial Acc. Com.* (L. A. 20142, *post*, p. 278 [188 P.2d 32].)

■ Petitioner's employe, Rogers, was burned by electricity when the boom of a locomotive crane (which reached about 59 feet above the ground when extended) came in contact with a high-voltage electric line (which ran about 44 feet above the ground). A part of the power in the line was used by petitioner. The accident occurred at night on an unlighted street which "had been taken over by the United States Maritime Commission, and the California Shipbuilding Corporation, as the agent for the Maritime Commission, controlled the traffic of that street. At that time it was not open to the public generally. . . ." Such street was adjacent to a shipyard of petitioner and was regularly used by it in its operations. The "hoists were continually dropping their loads" on the "rough road." On the end of the boom was a light which shone down; it was impossible to see above the crane. The crane crew had been sent to pick up a load of material which, as had happened on numerous other occasions to other material, had been dropped on the road. Before the boom was raised, members of the crew, including Rogers, looked with great care for high-voltage wires; none were visible.

The uncontradicted evidence disclosed the following circumstances: There were high-tension wires "all through the yard there at the start of Calship [more than three and one-half years before this accident] and they gradually took

[some of] them down because they were running into them too often.'' Some of the remaining wires were lighted but ''lots of places'' they were not. The wire which ran above and across the road, and with which the crane came in contact on the occasion of petitioner's injury, fell in the latter category. Because of the lighting conditions and the location of wires, the operators of locomotive cranes, although they knew of Electrical Safety Order No. 7-5050 of the commission[1] and were instructed by the night superintendent in charge of transportation to obey it, often could not perform work assigned to them without bringing their equipment within six feet of high-tension wires. Locomotive cranes were frequently sent at night to work upon the road which was the scene of the accident. Such road, by reason of petitioner's right of control over it, its location, and the manner and frequency of its use, must be regarded, insofar as concerns knowledge of its condition and ensuing responsibility for using it in that condition, as being at least in effect a part of petitioner's plant. The type of job which was being performed when Rogers was burned was considered an ''emergency'' because ''someone might run into the load.'' About a year before Rogers was injured, a similar accident involving the same crane had happened at about the same place under similar conditions. The occurrence of the previous accident was known to the superintendent of transportation and to the foreman who dispatched the crane to the road.

The long continued maintenance of these conditions was properly found to constitute serious misconduct. Members of the crane crew were required to go into an unsafe place of employment in violation of statute. (Lab. Code, §§ 6400-6406.) The violation of the commission's Ship & Boat Building Safety Order No. 1842[2] made practically impossible the observance by the crane crew of section 7-5050 of the Electrical Safety Orders, although such employes knew of and attempted to obey the latter order.

It does not appear that either the foreman or the superintendent above mentioned was responsible for or had authority

---

[1]''The operation . . . of any . . . equipment . . . near high-voltage lines, is hereby expressly prohibited, if at any time during such operation . . . it is possible to bring such equipment . . . or any part thereof within six feet (6') of such high-voltage lines.'' (Cal. Adm. Code, tit. 8, § 2603, subd. (b).)

[2]''(f) Adequate lighting shall be provided in the areas where locomotive cranes are working after dark.''

to correct the physical conditions under which the crane crews were required to work. Nor does it appear that the foreman, who had the authority and duty to send "the cranes out to do the work wherever the job was to be done," also had discretion to refuse to order the picking up of an emergency load in the interest of the safety of the crews under him. Nevertheless, the necessarily implied finding that there was serious and wilful misconduct on the part of a managing agent or agents of petitioner corporation is not without adequate, and, under the circumstances shown, sufficiently specific, evidentiary support. For three and one-half years the physical arrangement of petitioner's shipyard was such that in the regular course of operations, violations of section 7-5050 of the Electrical Safety Orders could not always be avoided and occurred "too often." From this state of affairs, it is logical to infer that subservient employes were not responsible for the yard arrangement (including the adjacent street) and that the conditions of its maintenance became known to persons with authority to correct it. In fact, the danger apparently was recognized, at least to some extent, by a person with such authority, who caused the removal of some of the offending wires and the lighting of some others.

In the situation of a single instance of, or a temporary or new occurrence of conditions amounting to, serious misconduct it is necessary, in order to attribute such misconduct to a corporate employer, to show with reasonable particularity that the reckless disregard for safety was on the part of some particular person with general discretionary power of direction and control of the integral part of the business wherein the misconduct took place. (*Bechtel etc. Corp.* v. *Industrial Acc. Com.* (1944), 25 Cal.2d 171, 174-176 [153 P.2d 331]; *Vega Aircraft* v. *Industrial Acc. Com.* (1946), *supra*, 27 Cal. 2d 529, 533; *California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1946), 27 Cal.2d 536, 546 [165 P.2d 669]; *California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1944), 64 Cal. App.2d 622, 627 [149 P.2d 432].) But in a situation where there are obvious, fixed, long-maintained conditions of hazard, and where crews are repeatedly required to work thereunder, it can be inferred that such conditions must have been known to responsible managing agents. The conclusion of the commission that petitioner is responsible for the flagrant maintenance for years of unsafe places, including the dark, rough and power-line carrying or crossed street, in which cranes with inadequate (under such circumstances) lighting were

frequently required to operate is not, in the circumstances of the case, unwarranted.

For the reasons above stated, the award of increased compensation is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.

EDMONDS, J.—I fail to find any evidence which would reasonably support the conclusion, stated in the majority opinion, that the street upon which the accident to Rogers occurred, "by reason of petitioner's right of control over it, its location, and the manner and frequency of its use, must be regarded, insofar as concerns knowledge of its condition and ensuing responsibility for using it in that condition, as being at least in effect a part of petitioner's plant." In my opinion, the fact that the public street "had been taken over by the United States Maritime Commission, and the California Shipbuilding Corporation, as the agent for the Maritime Commission, controlled the traffic of that street," does not warrant the inference which has been drawn from it. So far as the record shows, the public street was used as it existed at the time; there was no "long continued maintenance [by the employer] of these conditions." Quite evidently, the traffic control was maintained to prevent persons who had no essential business at the war plant from visiting it and to allow the freest use of the street for the movement of material. But this use was not exclusive, and the situation was much different from that of the company's yards where the employer was free to lay out the facilities and control the working conditions.

Under these circumstances, the public street was not "a place of employment" within the meaning of section 6400 of the Labor Code. Every employer operating trucks or other automotive vehicles is confronted with the necessity of sending additional equipment to aid one which has become disabled on the road. He is not responsible for the condition of the street where the breakdown occurred, and he has no right to change the physical structures which he may find there. Moreover, as far as the present case is concerned, there is no evidence that any "executive, managing officer, or general superintendent" of the employer either knew of the location of the high power line or that one of its cranes had ever been operated in close proximity to the dangerous wires.

Accordingly, no factual basis whatever exists to affirm the award because "it is logical to infer" that the condition of the street "became known to persons with authority to correct it." The removal or relocation of wires on the company's premises justifies no inference in regard to the line of a public utility in the public street. There is no evidence that the employer could have removed the high voltage line from its then location; on the contrary, the shipyard was only one of the customers supplied by power from that source. It should also be noted that the power line did not parallel the street but crossed it, and at only one point could the boom have come in contact with the wires. Also, the testimony discloses no one higher in authority than the night supervisor of transportation and a rigger foreman who knew of the prior accident at the place where Rogers was injured, or that the locomotive crane had ever worked there. For these reasons, the commission's finding that the employer was guilty of serious and wilful misconduct consisting of a violation of the statutory requirement of a safe place to work is not supported by the record.

As to the operations in the street, the crane was in charge of Bagnard, a rigger foreman. He had no knowledge of high voltage wires "exactly at that location" but knew there was a line "down there somewhere." However, unless Bagnard was an "executive, managing officer, or general superintendent" of the shipyard, the finding that the compensable injury of Rogers "was proximately caused by the serious and wilful misconduct of the employer, . . . in that the employer failed to exercise the necessary, or any care, to ascertain the location of the high powered wires" cannot be sustained for the case falls exactly within the rule stated in the majority opinion: "In the situation of a single instance of, or a temporary or new occurrence of conditions amounting to, serious misconduct it is necessary, in order to attribute such a misconduct to a corporate employer, to show with reasonable particularity that the reckless disregard for safety was on the part of some particular person with general discretionary power of direction and control of the integral part of the business wherein the misconduct took place."

Paraphrasing and quoting in part the analysis made by Mr. Justice Schauer in annulling an award to an employee because of injury sustained when a crane being operated in a shipyard contacted a high voltage line (*Bechtel etc. Corp.*

v. *Industrial Acc. Com.*, 25 Cal.2d 171 [153 P.2d 331]), the rights of the parties may be stated as follows:

In order to impose upon a corporate employer liability for increased compensation, the serious and wilful misconduct specified by the statute as justifying the additional award must be ''on the part of an executive, managing officer, or general superintendent'' of the corporation. In the present case, the foreman Bagnard was the only supervisory employee of petitioner guilty of violating the safety orders upon which the commission based its award. He and the members of the crew working under him were the only employees of petitioner present at the site where the steel was to be picked up by the crane. One Corder was the night supervisor of transportation and rigger foreman Wofford worked under his direction. Corder reported to the Superintendent of Transportation who was on duty only in the daytime. Above all of these men was the general manager of the yard. Neither Corder nor Wofford gave any directions as to the placing of the truck crane nor did they examine the lighting conditions. Corder did not know that the crane had been sent out, and was unaware that any crane had been operating in close proximity to the power line. Wofford, the rigger foreman who dispatched the crane, did not know where the job was to be done but knew that the crane was going in the general direction of high voltage wires. His answer to the question ''whether as a matter of practice cranes were working in close proximity to high voltage lines'' was somewhat equivocal, but referred to what had been done in ''the yard'' before power lines were removed. Neither Corder nor Wofford had ''charge of a 'part or branch' of his employer's business comparable to the excavation of an entire gravel pit or the erection of an entire building. It cannot be said that a single truck crane, operating under the conditions related, was a 'department' over which . . . [either of them] had authority. Manifestly, . . . [each of these persons] was an employee occupying a relatively inferior and subservient position.''

Upon the reasoning of the Bechtel case, I would annul the award of increased compensation.

Petitioner's application for a rehearing was denied January 29, 1948. Edmonds, J., and Spence, J., voted for a rehearing. Shenk, J., did not participate on petition for rehearing.