[Civ. No. 13720.   First Dist., Div. One.   Apr. 27, 1948.]

SUN INDEMNITY COMPANY OF NEW YORK, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and JESSIE D. McKINNEY, Respondents.

W. N. Mullen for Petitioner.

T. Groezinger and John A. Rowe, Jr., for Respondents.

BRAY, J.—The questions presented for determination by this court are whether the evidence supports the findings of the commission (1) that applicant's present mental condition resulted from her industrial injury; (2) that she was incompetent or insane when she signed a compromise and release agreement; and (3) that the employer, on or about July 1, 1944, failed to provide her with necessary medical treatment?

The commission found that on October 19, 1943, applicant sustained injury occurring in the course of and arising out of her employment, by slipping on some grease on linoleum and falling, "striking her back with resultant back pathology and insanity." The fact of injury is not disputed. The main attack is on the finding that such injury caused her insanity. Applicant, from the date of her fall until February 29, 1944, remained away from work. She worked part time from March 21, 1944, to September 15, 1944, when she was again forced to leave her employment. On April 24, 1945, applicant and the carrier entered into a compromise and release agreement, approved by the commission, by which she received $1,200 in addition to the cost of medical treatment to that date and compensation theretofore paid in the sum of $561.45. On June 29, 1945, applicant was declared incompetent. On application by her guardian the commission set aside the order approving the compromise and release upon the ground that she was incompetent at the time she executed the document.

The sole function of this court is to determine whether there is substantial evidence, including permissible inferences, to support the findings of the commission, as we are not permitted to interfere with a finding which is based upon conflicting evidence or conflicting inferences which might fairly be deduced therefrom. (*California Shipbuilding Corp.* v. *Industrial Acc. Com.*, 27 Cal.2d 536 [165 P.2d 669]; *Riskin* v. *Industrial Acc. Com.*, 23 Cal.2d 248 [144 P.2d 16]; *Pacific Lbr. Co.* v. *Industrial Acc. Com.*, 22 Cal.2d 410 [139 P.2d 872]; *Associated Ind. Corp* v. *Industrial Acc. Com.*, 18 Cal.2d 40 [112 P.2d 615]; *Schaller* v. *Industrial Acc. Com.*, 11 Cal.2d 46 [77 P.2d 836].) Even though we might consider that the weight of evidence is to the contrary, there is substantial

evidence from which the commission could find, or at least reasonably infer, that applicant's insanity resulted from her fall.

The case contains a long, involved history, several transcripts, and voluminous medical reports. Under the above rule, only the facts favorable to applicant will be set out. Contradictory evidence will be omitted. In her fall applicant received a compression fracture of the 12th dorsal vertebra. She remained in the St. Francis Hospital from the time of her injury until some time in January, 1944, when she was dismissed, wearing a brace. On January 27, she was readmitted because of pain in the back and groin due to the brace. She left the hospital on February 9. On March 21, she returned to work, but was able to work only a couple of hours a day, having to spend "a lot of time lying down and resting." April 5, when seen by Dr. Atkinson, applicant complained of pain in the lumbar region, with fatigue on walking and chronic constipation, the latter aggravated since her injury. A somewhat similar situation was found by Dr. Dresel on April 21. June 26, applicant was still complaining of soreness and weakness in her back. August 10, X-rays showed "an irritable duodenum consistent with small ulceration or gallbladder disease." September 30, she was hospitalized with "acute enteritis" and in an apparent "state of nervous exhaustion." She was dismissed October 11, but readmitted because of "spastic colon." She was discharged November 25. September 30, Dr. Taylor found applicant to be still suffering considerable pain in her back. On August 3, she had seen Dr. Taylor, complaining of considerable distress and pain in her back. He found that she was "decidedly in need of medical attention and orthopedic care." He referred her to Dr. Abbott, who provided her with another brace. Dr. Abbott stated that on December 4, "Her symptoms are due at present to the compression of the twelfth thoracic body, plus a very faulty posture." Dr. Taylor found trouble in her gastrointestinal tract. She was in a "rather rundown nervous condition." ". . . I cannot help but feel that this fracture which caused her considerable pain and with which she tried to work over a long period of time has upset her nervous system to such an extent that it is very much responsible for her present condition, illness, etc." In December she was hospitalized at Ross General Hospital by Dr. Tyler "for observation as to her vague abdominal symptoms of nausea and pain and because

of the possibility of a fecal impaction." Dr. Pate saw her three or four times in December. He stated: ". . . I thought she was a psychoneurotic and that the condition dated back to the time of her injury." Moreover, he felt that it was entirely possible that her mental state was the early manifestation of a true psychosis. February 1, 1945, she still had considerable pain in her back, requiring a sleeping pill at night for relief. She was again hospitalized from February 17 to February 22, as apparently she had been unable to keep anything on her stomach and "she complained bitterly of various abdominal pains." She was incoherent at times and exceedingly nervous. She was readmitted February 26, because of incessant vomiting, and a "tentative diagnosis was made of extreme psychoneurosis." About March 9, she attempted suicide and was admitted to a hospital, remaining until April 19. Dr. Schmidt diagnosed her on March 23 as "sufficiently depressed, neurotic and melancholic to be mentally unstable." Dr. Schmidt testified on November 24: ". . . I feel definitely her injury was part of the cause of her nervous breakdown or mental instability, in spite of the fact that she didn't say a word to me about it." May 24, she was admitted to Stanford Hospital, where she refused to eat, stating she wanted to die. She did not leave her bed to perform bodily functions. Dr. Lubin, who saw her there, "felt that the injury to her back, her subsequent hospitalizations and unemployment could have been a cause of her mental disorder." On June 29, under a petition for commitment to the state hospital, the medical examiners made the diagnosis of depressive mania and she was committed. At the Napa State Hospital on July 2, 1945, a diagnosis of manic-depressive psychosis, depressed type, was made.

Dr. Alfred S. Oliver of the staff of that hospital testified that it was his opinion that there was a direct relation between the injury to her back and her present mental status. It was his opinion that her mental condition had existed for a peroid of "months" prior to her commitment to the Napa State Hospital. While about a year and a half before her accident, applicant had been in the St. Helena Sanitarium for what was diagnosed as "chronic constipation, arterial hypotension and nerve exhaustion," and while there was medical evidence to the effect that applicant's condition did not result from the accident (Dr. Schaller stated that "her fractured vertebra was but an incident and not a determining factor in

her present condition''), the evidence before summarized is substantial and sufficient, if believed (and it was believed by the commission), to support its findings.

### The Compromise Agreement

The same is true of the finding that at the time of the execution of the compromise agreement, April 24, 1945, applicant was incompetent. To show that there was substantial evidence to support this finding it is only necessary, in addition to the foregoing evidence, to refer to the following: Dr. Schmidt, who examined applicant on March 22, 1945, about a month before the date of the agreement, testified that when he saw her she was mentally unstable to the extent that she was incompetent to ''handle her own problems'' and that if she received no psychiatric treatment in that month ''there is not one chance in a hundred she recovered sufficiently to have mental stability'' at the time of executing the agreement. Mrs. Welch, who cared for applicant from April 19, 1945, until May 24, 1945, testified that applicant was unable to prepare her own food, was depressed and anxious, and ''sometimes she would stare at the ceiling and refuse to answer questions.'' Although prior to her injury she was a smart looking, neatly dressed businesswoman, at the time she habitually wore an old coat and safety pins, with a rag over her head. Dr. Lubin saw applicant at Stanford Hospital approximately one month after she signed the document. While he refused to give an opinion on her competency prior to his seeing her, he felt that she was incompetent at the time he saw her and advised that a guardian be appointed and that she be committed to a state hospital. He stated that she had shown a progressive decline during the preceding year or so. Dr. Oliver, who saw her at the Napa State Hospital from July 2 on, testified that in his opinion her mental condition had existed for a period of ''months'' prior to her commitment. Dr. Oliva testified that he saw applicant March 9, the day after she took poison, and she was under his care until April 19 (five days before she signed the release). He definitely felt her to be of unsound mind, and tried to have her committed.

The testimony of other doctors and lay witnesses to the effect that applicant was of sound mind at the time of the execution of the release created a conflict in the evidence, but the commission resolved that conflict in favor of applicant. The medical picture as disclosed by the evidence introduced by applicant shows a situation in which after the accident her

nervous condition grew progressively worse until insanity resulted.

■ Petitioner contends that Dr. Schmidt's opinion that applicant's present condition was induced by her injury was without foundation, and cites various cases which hold that opinions of medical experts must be based upon facts in the case. While certain facts concerning applicant's prior condition and treatment were unknown to him at the time he saw applicant, after these facts were called to his attention he continued in his opinion that she was mentally unsound when he saw her. "The opinions of qualified medical witnesses with reference to the origin and cause of the injury are valid evidence which will support an award. [Citing cases.]" (*Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 19 Cal.2d 622, 629 [122 P.2d 570, 141 A.L.R. 798].) The weight of the evidence of experts is to be determined by the commission. (*State Comp. Ins. Fund* v. *Industrial Acc. Com.*, 195 Cal. 174 [231 P. 996].)

## Medical Treatment

■ The commission found that "The employee was required to and did secure medical treatment commencing July 1, 1944, upon failure of the defendants to provide the same," and allowed applicant the value of such medical treatment. The evidence upon which this finding is based is the testimony of applicant herself. In March, 1944, she told the carrier that she wanted another doctor, so on April 21, 1944, she was examined by Dr. Dresel, another of the carrier's physicians. Dr. Dresel did not testify, but a letter from him to the carrier dated May 3 is in evidence, in which he opines that she is able to return to work. "However, she feels that she needs a little further treatment, such as some supplementary physiotherapy following work. This could be given to her with some benefit, as it would strengthen her muscles." The letter ends up: "I would like to review this patient again in one month's time." The last time he treated her was the end of June, and he then told her he was going away for two months. She had an appointment to see Dr. Dresel on his return, but did not wait for him. On August 3, she went to Dr. Taylor "Because I had this pain all the time . . . The insurance company's doctors were not helping me any and I had to go to some doctor; that's all." She was then asked if Dr. Dresel was treating her and she said that he was but "went on a two months vacation and left me." "I spoke to Dr. Taylor about Dr. Dresel

being away and when he came back I had an appointment with him.'' Dr. Taylor told her it would not be necessary for her to keep the appointment as Dr. Abbott and he were now taking care of her case. When specifically asked if she had an appointment with Dr. Dresel she testified: ''The insurance man 'phoned and asked me to come in and I said I would wait until I saw Dr. Dresel before I came in; it was nearly that time.'' When asked if she was satisfied with the treatment given her by Dr. Dresel up to the time he went on his vacation she said that he did not do anything and she was still in pain. In spite of this she demurred in no way to his making an appointment with her more than two months off, and when most of that time had elapsed informed the carrier that she would wait for Dr. Dresel's return. She again testified that she was not satisfied with Dr. Dresel's treatment so she went to Dr. Taylor. When asked if she asked the carrier for a change of doctors after seeing Dr. Dresel ''in May,'' she said, ''No, I didn't; Dr. Dresel was away.'' Later in her testimony she stated that she last saw Dr. Dresel in late June. Again when asked why she went to Dr. Taylor she stated that she was in pain and ''wanted relief.'' She stated that she saw Dr. Taylor in June. Upon being shown a letter from Dr. Taylor in which he stated that he first saw her on August 3, she then admitted that was the date when she first saw him. When asked if Dr. Dresel had returned at that time she stated, ''No, sir. I don't know that he had, I will say, as far as I know.'' As Dr. Dresel last saw applicant about June 26, it must be assumed that the two months he took for vacation were July and August. As we have to take the testimony most strongly supporting the ruling of the commission, we must assume that Dr. Dresel had not returned from his vacation at the time when, in August, applicant first saw Dr. Taylor. The situation as disclosed by the evidence, then, is that applicant at the end of June saw Dr. Dresel. He told her he was to be away for two months, and made an appointment to see her on his return. Apparently the time of such arrangement was satisfactory to her, for she made no complaint of it, and when the insurance man phoned her to come in she said she would wait until she saw Dr. Dresel as ''it was nearly that time.'' It is apparent also that her main reason, expressed more than once, for seeing another doctor, was that she did not feel that the insurance company's doctors were helping her. The situation here did not justify her going to a doctor of her own choosing without first either contacting Dr. Dresel's

office or the carrier and requesting that another doctor be provided. If she was dissatisfied, as the evidence discloses she was, she was not entitled to employ a doctor until she had first given the employer or his carrier the opportunity of providing further care. This they had done, when three or four months before she had complained of the service she was getting and was sent by them to Dr. Dresel. A reading of her testimony shows that her main reason for going to Dr. Taylor was her dissatisfaction. She was not too sure that Dr. Dresel was away. It is unfortunate that Dr. Dresel was not called to state during what period he was away. However, assuming that she felt in need of treatment before the date of his return, or her appointment with him, that would not justify her going to another doctor and continuing with him and other doctors and incurring great hospital expense, breaking her appointment with Dr. Dresel, and not informing the employer, or the carrier, of this fact.

Section 4600 of the Labor Code provides that medical, surgical and hospital treatment, etc., reasonably required, shall be provided by the employer. ''In the case of his neglect or refusal *seasonably* to do so, the employer is liable for the reasonable expense incurred by or on behalf of the employee in providing treatment.'' (Emphasis added.) There is no contention here that the employer *refused* such treatment. It cannot be said that there was any neglect seasonably to do so. Taking the case in the strongest aspects the evidence will bear, it really resolves into a question of whether, where the employer has provided the employee with a doctor, who, after notifying the employee of his impending two months' absence and after making an appointment agreed to by the employee, leaves without designating a substitute doctor, it is such neglect which under the Labor Code, justifies the employee in going to a doctor of her own choosing, without first giving either the office of the designated doctor or the carrier an opportunity to provide medical assistance. Of course, we are not discussing here a sudden emergency. While applicant claims to have been in pain, there is no evidence that it was any different or greater pain than she claimed to be suffering at all times. Moreover, even an emergency does not justify an employee in remaining over a long period of time under the care of the emergency doctor, at least without notifying the carrier, and particularly, where, as here, the employee, in order to con-

tinue on with her new doctor, broke an appointment with the one provided by the carrier.

The case which we have found which tends to give the strongest support to respondents' position is *Massachusetts etc. Ins. Co.* v. *Pillsbury*, 170 Cal. 767 [151 P. 419]. However, the facts in that case are quite different from those here. There the employee was dissatisfied with the advice given him by the surgeon selected by the carrier, who had amputated his crushed finger. After he had communicated that dissatisfaction to the carrier, he was directed to go to another surgeon. However, that surgeon was out of town, apparently indefinitely. He then went to his family physician. The court upheld an award for the latter's fees, holding that the carrier had neglected seasonably to provide the treatment reasonably required, as the employee "was not bound to wait indefinitely until [the surgeon] should return." (P. 771.) There the employee needed urgent and continuous treatment. Here the employee did not require such treatment at the time in question and agreed to the date of the deferred appointment without demur. Moreover, the evidence shows that while applicant was under the care of Dr. Dresel she was also under the care of Dr. Atkinson, whom she had seen on or about April 5. No reason is given why she did not go to Dr. Atkinson instead of to a new doctor. In *Gildersleeve* v. *Industrial Acc. Com.*, 212 Cal. 762 [1 P.2d 1], the only case cited by respondents, the tender of medical aid was not made to the employee personally and also was contingent upon the employee first getting a certain finding from the commission. The court upheld a ruling of the commission to the effect that this did not constitute a true tender of medical treatment.

Schneider on Workmen's Compensation Law, volume II, 2d edition, section 491, page 1626, states: "When the employee abandons the medical and hospital service supplied by the employer, and secures other treatment of his own choice, he does so at his own risk, and cannot have the expense of the service of his own choice allowed against the employer or insurer unless he can satisfy the commission that the service supplied by the employer was inadequate or inefficient to an extent that justified the employee in abandoning it."

That the employee who desires to change physicians must notify the employer (or the carrier) is shown by section 4601 of the Labor Code, which provides that "If the employee so requests, the employer shall tender him one change of physicians" and provides the method to be followed. The

section also provides that the employee in any serious case is entitled *on request* to the additional services of a consulting physician.

There can be situations which would constitute neglect under the Labor Code, for a physician furnished by the employer to leave an employee for two months without designating a substitute, but under the circumstances here such is not the case. The employee did not need immediate treatment. This is shown by the acquiescence of the patient in the appointment date and the fact that when called by the carrier's agent near the date of the appointment, applicant stated that she would wait for Dr. Dresel's return. Far from neglecting applicant, the carrier was solicitous enough to contact her voluntarily.

The following portion of the findings and award of the commission is annulled, to wit: "3. The employee was required to and did secure medical treatment commencing July 1, 1944, upon failure of the defendants to provide the same, and is entitled to recover the reasonable value thereof, the same to be fixed by this commission subsequently upon request and the filing of itemized bills in the event that the parties are unable to adjust the bills out of Court." In all other respects, the award is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied May 27, 1948. Petitioner's application for a hearing by the Supreme Court was denied June 24, 1948.